**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**
**CIVIL DIVISION**

| | | |
|---|---|---|
| **ELIZABETH A. JORDAN**, | ) | |
| Individually and as Administratrix of the | ) | **CASE NO**.: |
| Estate of **WAYNE K. JORDAN**, deceased, | ) | |
| 1991 Stake Drive | ) | **JUDGE:** |
| Green, Ohio 44232 | ) | |
| | ) | |
| **PLAINTIFF**, | ) | **COMPLAINT AND** |
| | ) | **JURY DEMAND** |
| v. | ) | |
| | ) | |
| **SUMMIT COUNTY, OHIO AND** | ) | |
| **SUMMIT COUNTY BOARD OF** | ) | |
| **COMMISSIONERS** | ) | |
| 175 South Main Street, Suite 700 | ) | |
| Akron, Ohio 44308, | ) | |
| | ) | |
| **SHERIFF STEVE BARRY** | ) | |
| SUMMIT COUNTY JAIL | ) | |
| 53 University Avenue | ) | |
| Akron, Ohio 44308, | ) | |
| Individually and in his office capacity as | ) | |
| Summit County Sheriff, | ) | |
| | ) | |
| **DEPUTY STEVEN SCOFIELD** | ) | |
| SUMMIT COUNTY JAIL | ) | |
| 53 University Avenue | ) | |
| Akron, Ohio 44308, | ) | |
| Individually and in his office capacity as | ) | |
| Summit County Deputy Sheriff, | ) | |
| | ) | |
| **DEPUTY RAWNEY TRUNKO** | ) | |
| SUMMIT COUNTY JAIL | ) | |
| 53 University Avenue | ) | |
| Akron, Ohio 44308, | ) | |
| Individually and in his office capacity as | ) | |
| Summit County Deputy Sheriff, | ) | |

1

|  | ) |
| --- | --- |
| AND | ) |
|  | ) |
| **JOHN DOES 1 – 4** | ) |
| SUMMIT COUNTY JAIL | ) |
| 53 University Avenue | ) |
| Akron, Ohio 44308, | ) |
| Individually and in their office capacities as | ) |
| Employees/agents of Summit County Jail, | ) |
|  | ) |
| **DEFENDANTS**. | ) |

Now comes Plaintiff Elizabeth A. Jordan, who was Wayne K. Jordan's wife at the time of his death.  Plaintiff Elizabeth Jordan brings this suit individually and as the Administratrix of the estate of Wayne K. Jordan ("Wayne Jordan" or "Mr. Jordan"), and states for her claims against Defendants as follows:

## I.  PRELIMINARY STATEMENT

1) This federal and state civil rights action challenges:

   a) The failure of the Defendants to observe and guarantee the civil rights of the decedent, Wayne K. Jordan, as granted by the United States Constitution and applied to the State of Ohio through the Fourth, Eighth and Fourteenth Amendments;

   b) The failure of Defendants to adequately monitor and observe Mr. Jordan during his pretrial detention to detect the obvious objective and subjective factors that he was a suicide risk;

   c) The failure of Defendants to adequately train and supervise corrections staff so that they could detect the obvious objective and subjective risk factors in placed Mr. Jordan at risk of suicide;

d)  The failure of Defendants to detect that Mr. Jordan was at risk of suicide and, as a result, failing to provide the Mr. Jordan with protective custody, additional observation and/or with adequate healthcare as a known suicide risk at the Summit County Jail; and

e)  Seeking injunctive relief from this Court to order the Summit County Jail to observe the constitutional and statutory rights of mental ill and suicidal inmates in pretrial detention.

2)  Wayne Jordan informed staff at the Summit County Jail ("Jail") about his:

a)  Significant past medical history and his related chronic conditions;

b)  His past suicide attempt;

c)  His anxiety resulting from his arrest and first jail experience; and

d)  His concerns about the stigma of the charges against him.

3)  During the four months Mr. Jordan was held at the Jail in pretrial detention, he exhibited or experienced nearly every identified risk factor for pretrial detainee suicide, including: white, male, held on an offense alleging sexual assault and/or murder of a child, history of substance abuse, history of medical problems, history of mental illness, history of psychotropic medication, history of suicidal behavior, no history of prior arrests and held in a detention facility.[1]  Notably, "90 percent of suicides are associated with mental or addictive disorders and [] approximately two-thirds of individual who commit suicide are depressed at the time of the deaths."[2]

---

[1] ML Thigpen, National Study of Jail Suicide: 20 Years Later, U.S. Department of Justice National Institute of Corrections (2010) at 11-19 available at: https://nicic.gov/library/024308.
[2] *Id.* at 17 (citation omitted).

4) At the time of death, approximately 60 percent of inmates who commit suicide are in single occupancy cells.[3] Further, more than 70 percent of detainees who commit suicide use bedding as the instrumentality with nearly 30 percent using either the bed or bunk as an anchor point.[4]

5) In addition to the known risk factors and triggering events, Mr. Jordan was housed in a single occupancy cell complete with standard-issue bedding and bed, proving him with the most common opportunity and instrumentality with which to commit suicide.

6) Despite the risk factors identified on his Initial Health Screening form, the other known risk factors and his ongoing struggles to adjust to his pretrial detention, Mr. Jordan was never identified as a suicide risk or placed on a suicide protocol by the Defendants.  As such, he was never afforded the additional supervision or other protective measures to ensure his safety and well-being.

7) National correction standards and practices recommend two levels of supervision for suicidal inmates: close observation and constant observation.  Close observation requires staff to observe inmates at staggered intervals not exceeding every 10 minutes.  Constant observation is maintained for inmates who are actively suicidal and requires continuous, uninterrupted observation.[5]

8) The Summit County Jail Policy No. 16.2.7, Suicide Prevention, effective September 16, 2011, similarly requires that inmates who are "potentially suicidal" be placed  on the following suicide precautions, including but not limited to:

a)  Placed in a suicide gown and given a suicide blanket;

---

[3] *Id.* at 26-27.
[4] *Id.* at 22-25.
[5] *Id.* at 36-37.

b)  Placed in lock up with only a mattress;

c)  Observed at irregular intervals, not to exceed 10 minutes.

9)  Policy No. 16.2.7 defines "potentially suicidal" an "inmate who is not actively suicidal, but who is expressing thoughts of suicide and/or has a recent history of self destructive behavior or suicide attempts."  Further, the policy requires security personnel to "be familiar with and remain aware of factors that may indicate an increased chance for inmate suicide."

10) Despite his identified and observable risk factors, Mr. Jordan was never placed on any suicide protocol at the Jail and was instead left alone in his cell, with standard-issue bedding unobserved for a period of 41 minutes.

11) As a direct result of these failures by the Jail and Jail staff, Mr. Jordan committed suicide in his cell on February 12, 2016.  The Summit County Medical Examiner ruled Mr. Jordan's death was a suicide by asphyxia due to hanging.  (See Exhibit A, Summit County Medical Examiner's Report of Investigation and Report of Autopsy for Wayne Kyle Jordan, attached.)

## II.    PARTIES

12) Plaintiff Elizabeth A. Jordan was Mr. Jordan's wife at the time of his death and is an individual residing in Green, Ohio.  Plaintiff Elizabeth Jordan is the Administratrix of Mr. Jordan's estate in Summit County Probate Court Case No. 2017 ES 0060.  Plaintiff Elizabeth Jordan brings this suit in her individual capacity and as the representative of Wayne K. Jordan's estate.

13) Defendant Summit County, Ohio is a unit of local government organized under the laws of the State of Ohio.  Defendant Summit County is sued through the Summit County

Ohio Board of Commissioners who are named only in their official capacity pursuant to Ohio Revised Code § 305.12. Defendant Summit County is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.

14) Defendant Sheriff Steve Barry is currently the duly elected Sheriff of Summit County, Ohio.  Defendant Barry is a "person" under 42 U.S.C. § 1983 and at all times relevant hereto acted under color of law.  Among Defendant Barry's responsibilities as Sheriff are to assure compliance with statutory and constitutional protections for Jail inmates, to oversee the training and supervision of the employees and agents,  to oversee the operations of the Summit County Jail and to keep all persons confined therein safe in accordance with O.R.C. § 341.01.  Sheriff Barry was a policymaker with respect to practices and protocol at the Jail.  Defendant Barry is sued in his individual and official capacities.

15) Defendant Steven Scofield is a person who at all times relevant hereto served as an employee of Summit County assigned to the Summit County Jail and acted within the course and scope of their employment and/or agency and under color of state laws of the State of Ohio and the laws, regulations, policies, customs and usages of Defendant Summit County and its Sheriff's Department.  Defendant Scofield is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.  Defendant Scofield is sued in his individual and official capacities.

16) Defendant Rawney Trunko is a person who at all times relevant hereto served as an employee of Summit County assigned to the Summit County Jail and acted within the course and scope of their employment and/or agency and under color of state laws of the State of Ohio and the laws, regulations, policies, customs and usages of Defendant

6

Summit County and its Sheriff's Department.  Defendant Trunko is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.  Defendant Trunko is sued in his individual and official capacities.

17) John Does 1 - 4 are as yet unidentified individuals who at all times relevant hereto served as employees of Summit County assigned to the Summit County Jail and acted within the course and scope of their employment and/or agency and under color of state laws of the State of Ohio and the laws, regulations, policies, customs and usages of Defendant Summit County and its Sheriff's Department.  Defendant Does 1 - 4 are "persons" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law. Defendant Does 1 - 4 are sued in their individual and official capacities.

18) All of the above Defendants are individuals who acted under color of state law and are responsible for Plaintiff Elizabeth Jordan's damages in both their individual and official capacities.

### III.    JURISDICTION

19) This Court had subject matter jurisdiction over Plaintiff's claims pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1331.  Jurisdiction over Plaintiff's state law claims is conferred by 28 U.S.C. § 1367.

20) Venue is proper in this division under 28 U.S.C. § 1391(b), as the events giving rise to the Plaintiff's claims occurred within this judicial district.

21) It is believed that all Defendants reside in this judicial district.

## IV.    FACTS COMMON TO ALL COUNTS

### A.    Social and Medical History

22) At the time of his death, Mr. Jordan was a 63-year-old, white male.

23) Mr. Jordan married Plaintiff Elizabeth Jordan in 1995.  Although they had no children of

their own, Mr. Jordan enjoyed a close relationship with his two adult stepsons.  He also

had two children from a previous marriage.

24) Mr. Jordan was employed as a fitter/welder with JRB Heavy Construction for

approximately 20 years prior to being laid off in 2009.

25) After being unable to find new employment, Mr. Jordan applied for and received Social

Security Disability in 2010.

26) At age 19, Mr. Jordan was diagnosed with a seizure disorder.  He was prescribed Dilantin

and Phenobarbital to control those seizures.  Mr. Jordan was still taking those

medications at the time of his booking into the Jail and disclosed the seizure disorder and

those medications on his Initial Health Screening.  (Exhibit B1, Initial Health Screening

Form, October 2, 2015 and Exhibit B2, Initial Health Screen Printout, October 2, 2015,

attached.)  Mr. Jordan continued taking the Dilantin and Phenobarbital during his

detention.

27) In 1999, Mr. Jordan suffered a catastrophic left-sided cerebral aneurysm and hemorrhagic

stroke that damaged an area approximately the size of a fist.  Although not expected to

live, Mr. Jordan survived but suffered speech and hearing impairments.  Although

improved, Mr. Jordan continued to have some speech impairments through his death.

The cerebral aneurysm and hemorrhagic stroke were disclosed during his Initial Health

Screening.  (Exhibit B2, attached.)

28) Approximately six months prior to his arrest, Mr. Jordan was held for a week at St. Thomas Hospital following statements regarding suicide.  This information was disclosed during a mental health encounter on October 14, 2015.  (Exhibit F, Encounter Form dated October 14, 2015, attached.)  Mr. Jordan was placed in Citalopram (Celexa) for depression, although he discontinued this medication without medical supervision.

29) At the time of his arrest, Mr. Jordan was also on medication for high blood pressure, high cholesterol and glaucoma.  Mr. Jordan disclosed these conditions and medications on his Initial Health Screening.  (Exhibit B2, attached.)

30) A review of medical records from his primary physician showed that Mr. Jordan had been diagnosed with depression with anxiety.  The records also disclosed that Mr. Jordan had a history of "excessive alcohol use."  Mr. Jordan did disclose regular alcohol use during his Initial Health Screening.  (Exhibit B2, attached.)

**B.      Wayne Jordan's Arrest and Booking**

31) On September 28, 2015, a secret indictment issued against Mr. Jordan.  Summit County Court of Common Pleas Case No. CR-2015-09-3017.  The indictment alleged six counts of rape and three counts of gross sexual imposition involving a preteen female over a three-year period.

32) Mr. Jordan was arrested on October 2, 2015 by Detective Larry Brown and transported to the Summit County Jail. (Exhibit C, Prisoner Information Sheet, attached.)

33) Mr. Jordan cooperated during the Jail's booking process. (Exhibit C, attached.)

34) The "Initial Health Screening" is part of the Jail's booking process.  Each prisoner presented for admission to the Summit County Jail goes through this screening.

35) The Initial Health Screening is performed by a Jail staff member who fills out a form to record the results.  This form then becomes part of each prisoner's permanent Jail file.

36) There are two Initial Health Screening documents in Mr. Jordan's file.  The first, dated October 2, 2015 and timestamped at approximately 3:30 p.m. is incomplete and lacks any evaluation other than the "Deputy's Opinion."  The Mental Health Evaluation portion of the form is completely blank, although it includes an extensive review of mental health, drug and alcohol abuse and current and past suicide attempts and/or ideation.   Without any obvious basis, the individual completing this form concluded that Mr. Jordan was not a suicide risk and no further measures were taken at that time.  It is unclear from the face of the form which employee of the Summit County Jail completed this form.

37) Although standards issued by the National Commission on Correctional Health Care (2008) recommend asking the arresting/transporting officer's opinion about whether an arrestee is at a current risk of suicide, no such inquiry was made of the arresting/transporting officer, Detective Larry Brown, regarding Mr. Jordan's suicide risks.  (Exhibit B1, attached.)

38) At approximately 6:00 p.m. on October 2, 2015, a nurse at the Summit County Jail completed a second Initial Health Screening for Mr. Jordan.  (Exhibit B2, attached.) During this screening, Mr. Jordan disclosed his past and present medical history as described above.  He also told the disclosed that his brother committed suicide, although this is incorrectly recorded as his "mother."  When his vital signs were taken, his blood pressure and pulse were both elevated, which was attributed to this being his "FIRST ARREST."  Finally, although the printout records no indication of mental health issues or

10

suicide risk for Mr. Jordan, a referral for "mental health" evaluation is still made. (Exhibit B2, attached.)

39) Despite all of the disclosures regarding Mr. Jordan's past and current medical condition, his first-time offender status, the nature of the charges, his age and other known suicide risk factors, Mr. Jordan was housed in general population and no suicide prevention measures were taken.

40) Although Mr. Jordan denied suicidal ideation when asked during his second Initial Health Screening and at subsequent times, it is common for inmates who are committed to ending their lives to deny they are suicidal so that they will not be stopped.[6]   That makes it all the more imperative that jail staff consider an inmate's entire history and present behavior when assessing his or her suicide risk.  This is especially true with an individual whose medical, mental health and social history is as complex as Mr. Jordan's.

41) Mr. Jordan's family made a choice to leave him in pretrial detention at the Summit County Jail because they believed he would be safer there under constant supervision than if he were released into the community.

**C.      Wayne Jordan's Subsequent Behavior**

42) On October 7, 2015, Mr. Jordan asked that his "paperwork" be placed in his property bag so that other inmates could not see the charges.  (Exhibit D, Inmate Daily Logs Report, attached.)  This is consistent with concerns from suicidal inmates who are charged with crimes alleging sex acts with a minor.

43) On October 14, 2015, an unknown deputy requested that Mr. Jordan be evaluated because he felt that Mr. Jordan "needs to be on 1B for his safety [due to] his [history] of brain

---

[6] Lindsay M. Hayes, Suicide Prevention in Correctional Facilities: Reflections and Next Steps, International Journal of Law and Psychiatry 36 (2013) 188–194.

aneurysm & [patient's] actions like cutting in front of other inmates."  (Exhibit E, Narrative Progress Note dated October 14, 2015, attached.)

44) On October 14, 2015, an unknown deputy at the Jail requested that Mr. Jordan be evaluated because the deputy felt Mr. Jordan should "not be in general population." (Exhibit F, Encounter Form dated October 14, 2015, attached.)  During this encounter, Mr. Jordan stated that he was "sad, worried … [had] never been in trouble before," that it was his "first time in jail" and that he could not sleep.  He further stated that he was "depressed and anxious" and was "having a hard time adjusting to being in jail."

45) It was during this October 14, 2015 encounter that Mr. Jordan also disclosed his recent psychiatric hospitalization at St. Thomas Hospital.  (Exhibit F, attached.)

46) This form also correctly states that it was his brother that committed suicide rather than his mother as stated in the Initial Health Screening.  (Exhibit F, attached.)

47) As a result of this encounter, Mr. Jordan was diagnosed with an "adjustment disorder with mixed anxiety and depressed mood" (ICD-9 309.28).  Mr. Jordan was not prescribed any medication to treat this disorder.  However, he did agree to participate in weekly counseling, although it does not appear that Mr. Jordan ever attended any such counseling.  (Exhibit F, attached.)

48) Although Mr. Jordan was moved to Pod 1B, nothing in the records from the Jail indicated he was approved for weekly counseling.  Additionally, Mr. Jordan was never placed on any suicide risk prevention protocol.

**D.     Events Proceeding Wayne Jordan's Suicide**

49) Because of Mr. Jordan's medical history and his mental health issues, the Summit County Court of Common Pleas ordered a competency evaluation.  See Summit County Court of Common Pleas Case No. CR-2015-09-3017.

50) On November 18, 2015, a forensic mental health specialist from Psycho-Diagnostic Clinic spent 97 minutes evaluating Mr. Jordan at the Summit County Jail.

51) On December 2, 2015, a psychologist from Psycho-Diagnostic Clinic spent 65 minutes evaluating Mr. Jordan at the Summit County Jail.

52) Although they ultimately determined that Mr. Jordan was competent to assist in his defense, their visits to the Summit County Jail gave the Jail staff notice that Mr. Jordan's mental status was in question.

53) On January 14, 2016, the Summit County Court of Common Pleas authorized Dr. Robert L. Byrnes, Ph.D. to conduct an independent evaluation of Mr. Jordan.

54) On January 11, 2016, Dr. Byrnes spent 2.5 hours at the Summit County Jail evaluating Mr. Jordan at the Summit County Jail.

55) On January 22, 2016, Dr. Byrnes spent an additional 2.5 hours at the Summit County Jail evaluating Mr. Jordan at the Summit County Jail.

56) Although he was unable to complete his report due to Mr. Jordan's suicide, the request for records and Dr. Byrne's visits to the Summit County Jail gave the Jail staff notice that Mr. Jordan's mental status was in question.

57) On January 19, 2016, the Summit County Court of Common Pleas granted a motion to have Mr. Jordan further evaluated by Dr. Galit Askenazi, Ph.D., a neuropsychologist. Summit County Case No. CR-2015-09-3017.  Although Dr. Askenazi was unable to

evaluate Mr. Jordan, the order for further evaluation was an additional indication of Mr. Jordan's condition.

**E.**     **Wayne Jordan's Continued Deterioration**

58) During his four-month pretrial detention, Mr. Jordan's condition continued to decline and he was clearly not adjusting to his detention.

59) In letters home to his wife, Plaintiff Elizabeth Jordan, he expressed his emotional distress about his situation:

   a)  October 17, 2015 – "never been so scarde in my life." [sic]

   b)  November 4, 2015 – "Liz sorry never said this but I have been crying I miss you so much."

   c)  Undated letter – "I think of you every day but today I have broke down after talking to you.  I have cryed all after talk to you." [sic]

   d)  January 19, 2016 – "But I am afraid this has turn our lifes upside down.  Still can't believe I am still in jail.  I am very sorry for you too.  Thank you for trying to see me at jail today I miss you.  You do not diserve this." [sic]

60) In phone calls with his wife, which were recorded by the Summit County Jail, Mr. Jordan similarly expressed his distress.  Over the four-month period of his detention, Mr. Jordan made hundreds of calls to his wife for support.

61) On January 3, 2016, a follow up social work encounter with Mr. Jordan described him as "mildly unkempt," with moderate depression, mild anxiety and severe anger.  (Exhibit G, Encounter Form dated January 3, 2016, attached.)

62) In the days leading up to his suicide, Mr. Jordan continued making numerous phones each day to his wife.  These calls were all recorded by the Summit County Jail.  He was in obvious despair over his upcoming trial:

   a) February 11, 2016 at 10:38:36 – Mr. Jordan received bad news from attorney; states he is "not well"; repeats for his wife to "be prepared" multiple times (CSN 65415119);

   b) February 11, 2016 at 11:23:27 – Mr. Jordan states his case is "pretty much a done deal"; that he is having "problems in here too"; that the outcome of the case is "going to change things drastically"; "I don't think I'm well"; and that he's "trying to prepare [his wife] a little bit for the worse that might be coming" (CSN 65415749);

   c) February 11, 2016 at 14:19:16 – Mr. Jordan states: "It don't look good"; "I don't understand things"; "I'm really upset; "It's not looking good at all"; "[If this] continues the way it's going I'll never get back home" (CSN 65417025);

   d) February 11, 2016 at 20:54:13 – Mr. Jordan states: "I think it's me just going crazy in here": "Starting to lose my mind"; and "It's getting to me really bad."  And, in a tragic instance of foreshadowing, Mr. Jordan tells his wife that he has "two little blankets" and a sheet (CSN 65421291); and

   e) February 12, 2016 at 9:24:07 – Mr. Jordan asks his wife if she thinks he "will ever get out of jail."  (CSN 65423199)

63) According to the Medical Examiner's Investigation, Mr. Jordan was scheduled for trial on February 16, 2016.

### F.    Wayne Jordan's Suicide

64) On February 12, 2016, Mr. Jordan committed suicide by hanging himself in his cell.  (See
Exhibit A, Summit County Medical Examiner's Report of Investigation and Report of
Autopsy for Wayne Kyle Jordan, attached.)   Mr. Jordan used a blanket and bedsheet tied
around his neck and anchored to his bedframe to hang himself.  (See Exhibit H, Narrative
Progress Note, February 12, 2016.)

65) The timeline of Mr. Jordan's death is set out in various documents:

   a)  11:20 a.m. – Defendant Scofield served lunch to the inmates in Unit B.

   b)  11:50 a.m. – Meal trays were removed and inmates were placed in lockup.

   c)  11:52 a.m. – Defendant Scofield conducted a key tour.

   d)  12:33 p.m. – Defendant Trunko conducted a key tour and found Mr. Jordan
   unresponsive and called for assistance.

   e)  12:35 p.m. – Medical staff responded and attempted to move Mr. Jordan to the floor
   to assess his airway only to find he was still anchored to the bedframe:

> While attempting to move patient nursing staff noticed
> patient had a blanket tied around his neck.  Notified
> security staff that medical needed his blanket cut off.
> While security staff was retrieving cutting tool, nursing
> staff ripped blanket in half and noticed patient had his bed
> sheet tied around his neck and tied to hi bunk underneath.
> Nursing staff climbed onto bed to attempt to release sheet
> with no results.  911 tool brought in by security staff and
> sheet was cut.

   The nursing staff then began resuscitation efforts.  However, Mr. Jordan remained
   unresponsive with no pulse.

   f)  12:38 – Akron Fire Squad arrived and took over scene.

   g)  12:47 – Akron Fire Squad left with coroner to arrive.

(Exhibits A, H and I, attached.)

### G.    Policies and Procedures

66) Summit County Jail Policy No. 16.2.7, Suicide Prevention, effective September 16, 2011,

states in part:

> Summit County Jail staff **shall utilize direct supervision** as a
> method to assist in the prevention of inmate suicide.  Security
> personnel **shall be familiar with and remain aware of factors
> that may indicate an increased chance for inmate suicide.**
> When the potential for inmate suicide is suspected, **security staff
> will attempt appropriate intervention measures to prevent
> such action.**
>
> Suicide prevention and intervention measures include: **staff
> training, identification, monitoring, inmate assessment, staff
> communication, referral, and specialized housing**.

(Emphasis added.)

67) Summit County Jail Policy No. 4.1.0, General Policy on Corrections Training, effective

September 28, 2015, states in part:

> IV.     Correctional Officers shall receive training as follows:
>
> ****
>
> D. Other training mandated by standards:
> ****
> 3. Suicide detection, prevention, and response to be
> completed annually.

68) Summit County Jail Policy No. 8.2.2, General Housing, effective January 1, 2002, states

in part:

> IV. Inmate Supervision and Pod Management
>
> A. Surveillance/Supervision
>
> 1. Direct Supervision- **Pod Deputies shall be in
> continuous Direct Supervision** of inmates except in

17

certain emergency situations where intermittent
surveillance may be used.

2. Deputies shall emphasize the use of interpersonal
communication skills in dealing with inmates.

3. **Pod Deputies shall observe all areas of the pod**,
including but not limited to: **cells**, day areas, outdoor areas,
showers, storage rooms, laundry rooms, etc.

4. **Deputies must observe each inmate on the pod at
least once every twenty (20) minutes and be certain of
their well being.**

(Emphasis added.)

69) Summit County Jail Policy No. 10:5.0, Pod Management, effective  January 16, 2001,

states in part:

**PROCEDURE**:

I.        Inmate Surveillance - Because surveillance of inmates is
the **most important** aspect of the security of the jail, **Deputies
must work to avoid laxness and carelessness in regards to that
function**.
                                                    ****

C.        Direct Supervision Surveillance

1.        **Deputies will always maintain active surveillance
of inmates even when not making a round.**

a.        Pod Deputies in direct supervision will take
advantage of their continued close contact with
inmates by using their listening and observation
skills when engaged in routine duties (e.g. writing
reports, feeding**, talking on the telephone**, etc.)

b.        Housing Deputies shall use care to position
themselves in locations that allow **maximized
observation of their assigned pod whenever
stationary.**

2.        The following examples of inmate behavior are
possible indicators or warning signs of problems:

18

     **a.**     **Unusual or suspicious sounds or activities.**

     **b.**     **Uncommon quietness or especially loud noises.**

     **c.**     **Noticeable mood swings.**

     **d.**     **Increased intensity in inmates' actions.**

(Emphasis added.)

70) Summit County Jail Policy No. 10:6.2, Mental Health Housing, effective January 16, 2001, requires:

> Surveillance checks at least every fifteen (15) minutes on an irregular basis and includes documentation of the time conducted and notation of the inmate's apparent condition and the behavior occurring at the time of check.

71) The Summit County Jail Policy No. 16.2.7, Suicide Prevention, effective September 16, 2011, requires that inmates who are "potentially suicidal" be observed at irregular intervals, not to exceed 10 minutes.

72) Here, Mr. Jordan, who had multiple factors for suicide risk documented in his record that were known to Jail staff was left unobserved for a period of 41 minutes by Defendants Trunko and Scofield and other, as yet unidentified, defendants.  Minimally, he should have been observed at least every 20 minutes per Summit County Jail Policy No. 8.2.2, General Housing.  More appropriately, he should have been observed every 15 minutes, if not every 10 minutes, at irregular intervals under Summit County Jail Policy Nos. 10:6.2 and 16.2.7 because of his documented suicide risk factors.

73) Summit County Jail Policy No. 7.1.0, Suicide Detection and Response, effective September 16, 2011, states:

> Appropriate emergency measures shall be taken upon discovery of a suicide attempt which will include the removal of the life-threatening conditions, the requesting of assistance, following of

medical personnel directives in a manner than minimizes inmate harm, and proper documentation and record keeping.

****

**PROCEDURE**:

I. **All staff shall be attentive during their assigned duties, with special attention given to inmates, who may be suicidal, so that appropriate precautions and referrals may be made.**

****

III. Any staff member discovering an inmate attempting to commit suicide and/or harm himself shall:
    A. Notify Central Control that a suicide attempt has occurred; providing the location, manner of the attempt and the inmate's identity.
    B. Secure the area by ordering non-affected inmates to return to their cells or other designated location.
    C. **When safe to do so, enter area of the attempted suicide and attempt to remove the life threatening condition.**
    D. Administer first aid, if practical, until trained medical personnel arrive.  Then assist as directed.
    E. As directed or necessary, notify Central Control to coordinate additional assistance or resources needed.

(Emphasis added.)

74) Despite the policy that all staff be "attentive during their assigned duties, with special attention given to inmates, who may be suicidal," there is no evidence in the record to suggest that Defendants Trunko and Scofield and other, as yet unidentified, defendants, were adequately attentive to Mr. Jordan on February 12, 2016.  Certainly, he was not on any suicide risk prevention protocol and he was not observed at even the regular 20 minute interval, much less the 10 minute or 15 minute intervals for those on suicide risk prevention protocol as set forth in Jail policies for detainees at risk for suicide.

75) Brain damage from asphyxiation caused by hanging can occur within minutes and death can occur within 5 to 6 minutes.[7]  This short interval drives the 10-minute staggered observation policies for inmates on the close observation protocol.  However, it is also the reason why the 911 rescue tool is made readily available and why Summit County Jail Policy No. 7.1.0, Suicide Detection and Response, directs jail staff who discovery that an inmate has attempted suicide by hanging to remove the "life threatening condition" as soon as it is safe to do so.  Here, the failure of jail staff to immediately remove the blanket and bedsheet from Mr. Jordan's neck prevented medical staff from immediately rendering assistance -- a critical delay when mere minutes can mean life or death.

76) Nothing in Ohio Uniform Incident Report No. 058-1600690-02 indicates that Defendant Scofield attempted resuscitation or made any attempt to remove the blanket and bedsheet until directed by the medical staff to do so.  (Exhibit I, Ohio Uniform Incident Report No. 058-1600690 dated February 12, 2016, attached.)

77) After the Summit County Medical Examiner ruled Mr. Jordan's death a suicide, no further investigation was conducted.  (Exhibit I, attached.)

**H.    Summary**

78) As described in detail above, during the four months Mr. Jordan was held at the Jail in pretrial detention, he exhibited or experienced nearly every identified risk factor for pretrial detainee suicide, including but not limited to: being white, being male, being held on an offense alleging sexual assault of a child, being held in a detention facility and having no history of prior arrests.  Additionally, Mr. Jordan had a history of substance

---

[7] ML Thigpen, National Study of Jail Suicide: 20 Years Later, U.S. Department of Justice National Institute of Corrections (2010) at 28 available at: https://nicic.gov/library/024308.

abuse; an extensive history of chronic medical conditions, including brain damage; a present diagnosis of adjustment disorder with anxiety and depressed mood; a history of mental illness with psychotropic medication and a recent history of suicidal behavior, including a psychiatric in-patient hospitalization.

79) In addition to the known risk factors, Mr. Jordan was housed in a single occupancy cell complete with standard-issue bedding and bed, proving him with the most common method and instrumentality with which to commit suicide.

80) Further, Mr. Jordan was not observed at the mandated intervals pursuant to Summit County Jail policies and procedures and was left unobserved for 41 minutes, which provided him with the opportunity to commit suicide without detection.

**FIRST CAUSE OF ACTION**
**42 U.S.C. § 1983 CIVIL RIGHTS CLAIM FOR**
**DELIBERATE INDIFFERENCE**

81) Plaintiff Liz Jordan incorporates by reference the allegations in the paragraphs above as if those allegations were fully rewritten herein.

82) From the time that Mr. Jordan was admitted to the Summit County Jail, Mr. Jordan was a known suicide risk and displayed multiple risk factors throughout his detention.  These risk factors and his mental state were known to Defendants.

83) Further, over the course of his four-month pretrial detention, Mr. Jordan's mental health and emotional stability declined and his risk for committing suicide increased.  His deterioration and other known risk factors were known to each of the Defendants.

84) The actions of each and every one of the Defendants, including, but not limited to the following, constitute deliberate indifference to Mr. Jordan's serious medical need of suicidal risk intervention:

a) Failure to place him on any suicide prevention protocol whatsoever although Mr. Jordan identified a prior suicide attempt and a significant number of known suicide risk factors, including but not limited to: depression, chronic medical conditions and a recent prior inpatient psychiatric hospitalization;

b) Failure to adequately detect and monitor Mr. Jordan's worsening mental and emotional status between October 2, 2015 and February 12, 2016 as required under multiple Summit County Jail Policies;

c) Failure to "observe all inmates" at 20 minute intervals as required under Summit County Jail Policy No. 8.2.2, General Housing;

d) Failure to respond to Mr. Jordan's medical emergency on February 12, 2016 with reasonable promptness and care;

e) Failure to follow Summit County Jail Policy No. 7.1.0, Suicide Detection and Response, to immediately cut the blankets and sheets from around Mr. Jordan's neck; and

f) Failure to adequately investigate and punish the acts of the offending individuals who had deprived Mr. Jordan of his civil rights.

85) Through the acts described in this Complaint, Defendants have, under color of law, deprived Mr. Jordan of the rights, privileges and immunities secured by the Fourteenth Amendment to United States Constitution including, but not limited to, the right to be free from deliberate indifference to a serious medical need, the right to be free from cruel and unusual punishment and the right to reasonable medical treatment while detained so as not to unnecessarily and wantonly inflict pain.

86) The Defendants' actions and omissions described in this Count directly and proximately caused Mr. Jordan to sustain damages and extreme physical and emotional pain and suffering, which led to his death.

## SECOND CAUSE OF ACTION
## 42 U.S.C. § 1983 CIVIL RIGHTS CLAIM FOR FAILURE TO TRAIN

87) Plaintiff Elizabeth Jordan incorporates by reference the allegations in the paragraphs above as if those allegations were fully rewritten herein.

88) Defendant Barry and other as yet unidentified defendants were all individuals with supervisory roles with respect to the management of inmates at the Summit County Jail during the period of Mr. Jordan's pretrial detention.

89) As supervisors, these Defendants had an obligation to properly train their subordinates so as to protect the civil rights of inmates at the Jail.

90) The Defendants' training of Jail corrections staff was so substandard that it had the effect of causing and/or ratifying the unconstitutional indifference to Mr. Jordan's medical condition and risk of suicide, as described above in this Complaint. Thus, Defendants' failure to train caused Mr. Jordan's suffering and death.

## THIRD CAUSE OF ACTION
## WILLFUL, WANTON AND RECKLESS CONDUCT

91) Plaintiff Liz Jordan incorporates by reference the allegations in the paragraphs above as if those allegations were fully rewritten herein.

92) The individual Defendants acted in a willful, wanton and reckless manner, disregarding the serious risk to Mr. Jordan's rights and safety, while engaged in their functions as Sheriff, supervisors, corrections officers and other employees of the Summit County Jail. Their willful, wanton and reckless actions and omissions, including those described

above in this Complaint were the direct and proximate cause of Mr. Jordan's suffering and death.

## FOURTH CAUSE OF ACTION
### WRONGFUL DEATH

93) Plaintiff Elizabeth Jordan incorporates by reference the allegations in the paragraphs above as if those allegations were fully rewritten herein.

94) Defendants" actions and omissions as described above in this Complaint proximately caused the wrongful death of Mr. Jordan.

95) As a direct and proximate consequence of the wrongful death of Mr. Jordan, Mr. Jordan's next-of-kin have suffered emotional distress, mental anguish, monetary damages and such other damages as are recoverable in Ohio's Wrongful Death Statute, Revised Code Section 2125.01, et seq.

## FIFTH CAUSE OF ACTION
### (INJUNCTIVE RELIEF)

96) Plaintiff Elizabeth Jordan incorporates by reference the allegations in the paragraphs above as if those allegations were fully rewritten herein.

97) Mr. Jordan's suicide was a result of one or more grossly inadequate policies, practices and/or customs of the Summit County Jail, including:

   a) Inadequate training and/or supervision of Summit County Jail employees with regard to identifying detainees and prisoners who are at risk of suicide; and

   b) Inadequate policies and procedures to identify, monitor and protect detainees and prisoners who are at risk of suicide.

98) Plaintiff Elizabeth Jordan seeks to enjoin Summit County, the Summit County Jail and Defendant Barry from implementing its policies, practices and/or customs that caused and/or contributed to Mr. Jordan's suicide and death.

## JURY DEMAND

Plaintiff Elizabeth Jordan hereby demands a Trial by Jury of all the issues.

## PRAYER

WHEREFORE, Plaintiff Elizabeth Jordan prays for the following relief:

A)  Compensatory and punitive damages in excess of seventy-five thousand dollars ($75,000.00) on each cause of action in Causes of Action 1 through 4;

B)  Injunctive relief as set forth in Count 5;

C)  Attorneys' fees and costs;

D)  Pre- and post-judgment interest as appropriate; and

E)  Any additional relief this Court deems just and proper.

Respectfully submitted,

/s/ Melissa D. Berry
**Melissa D. Berry** (#0061935)
4638 5th Street NW
Canton, Ohio 44708
mberry1@neo.rr.com
(330) 546-7529

*Attorney for Plaintiff*