**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ELIZABETH A. JORDAN, *individually and as Administratrix of the Estate of Deceased*, Wayne K. Jordan, | ) | CASE NO. 5:17-cv-02047 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| SUMMIT COUNTY, OHIO and SUMMIT COUNTY BOARD of COMMISSIONERS, et al. | ) | <u>MEMORANDUM OPINION AND ORDER</u> |
| | ) | |
| Defendants. | ) | |

## I.     Introduction

This case arises from the suicide of an inmate at the Summit County, Ohio, jail on February 12, 2016.  Four months after being jailed pursuant to an indictment charging him with rape and gross sexual imposition involving a minor, Wayne K. Jordan ("Jordan") hanged himself in his cell.

Jordan's widow, Plaintiff Elizabeth A. Jordan ("Plaintiff" or "Mrs. Jordan"), individually and as Administratrix of Jordan's estate, filed a Complaint in which she alleges, among other things, that Defendants Summit County, Summit County Sheriff Steve Barry ("Defendant Barry" or "Barry"), two Sheriff's Deputies (Deputy Steven Scofield and Deputy Rawney Trunko ("Defendant Trunko" or "Trunko"), and unnamed "John Doe" employees of the Summit County

jail[1] were deliberately indifferent to Jordan's serious medical needs, leading to his death.  She asserts federal and state law claims and seeks damages.[2]

In a prior Memorandum Opinion and Order, the Court granted in part and denied in part Defendants' earlier filed Motion to Dismiss (Doc. 11).  Doc. 20.[3]  The following claims remain pending before the Court: Plaintiff's § 1983 deliberate indifference claim in the first cause of action against Defendant Trunko in his individual capacity; Plaintiff's § 1983 deliberate indifference claim in the first cause of action against Defendant Summit County; Plaintiff's § 1983 failure to train claim in the second cause of action against Defendant Barry in his official capacity, which is equivalent to a claim against Summit County;[4] and Plaintiff's state law claims in the third and fourth causes of action against Defendant Trunko in his individual capacity. Doc. 20, Doc. 28.

## A.    Motions for summary judgment

Defendants have filed a motion for summary judgment as to all remaining claims.  Doc. 40.  Plaintiff has filed a motion for partial summary judgment as to the § 1983 claim asserted under the first cause of action against Defendant Summit County.  Doc. 43.  Each side has filed opposition briefs and replies.  Doc. 48, 50, 51, 53.

As set forth in detail below, it is undisputed that, during Jordan's four months in the

---

[1] Plaintiff sued all individual Defendants in their individual and official capacities.  Plaintiff did not identify or seek to substitute named individual(s) for the John Doe Defendants by the November 12, 2018, deadline (Doc. 23).

[2] In her Complaint, Plaintiff also sought injunctive relief but later conceded that injunctive relief is not available. Doc. 12, p. 20.

[3] The Court dismissed the following claims: Plaintiff's first cause of action against Defendants Scofield and Barry in their individual capacities; Plaintiff's third and fourth causes of action against Summit County and Defendants Scofield and Barry in their individual capacities; and Plaintiff's fifth cause of action.

[4] "An official capacity claim filed against a public employee is equivalent to a lawsuit directed against the public entity which that agent represents."  *Scott v. Clay County, Tenn.*, 205 F.3d 867, 879 (6th Cir. 2000).

Summit County jail, he consistently denied having suicidal ideations; he did not attempt to harm himself before taking his life, and individuals in close communication with him, including Plaintiff, did not perceive him to be suicidal. It is also undisputed that jail personnel took prompt action upon finding Jordan unresponsive. A reasonable jury could not conclude that Defendants were deliberately indifferent to Jordan's serious medical needs or are otherwise liable for his death because there is no genuine issue as to any material fact. Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment, **DENIES** Plaintiff's Motion for Partial Summary Judgment, and dismisses with prejudice all remaining claims as to all remaining Defendants.[5]

## B. Other pending motions

In connection with the motions for summary judgment, Plaintiff has filed a motion in limine for an order granting judicial notice of government records (Doc. 41); a motion in limine to exclude the expert testimony and affidavit of Ruthann Paulus-Bland (Doc. 42); and a motion to strike portions of Ruthann Paulus-Bland's affidavit (Doc. 52).[6]

---

[5] As indicated above, Plaintiff did not identify or seek to substitute named individual(s) for the John Doe Defendants by the November 12, 2018, deadline. Accordingly, dismissal of Plaintiff's Complaint is as to all remaining defendants, including named defendants and unnamed John Doe defendants. *See* Doc. 23 (warning Plaintiff that failure to amend her pleadings to identify John Does by November 12, 2018, may result in dismissal of her case against the Doe Defendants).

[6] Within Plaintiff's opposition to Defendants' motion for summary judgment, Plaintiff also argues she is entitled to a negative inference from missing annual performance evaluations for Defendant Trunko for the years 2013-2015 and 2017. Doc. 48, pp. 17-18. Plaintiff contends that she is entitled to a presumption that the information in the missing performance evaluations was damaging to Defendants. Doc. 48, p. 18. Plaintiff has received performance evaluations for Defendant Trunko for other years which include some negative evaluations. Doc. 48, p. 18. Shane Barker, Administrative Captain at the Summit County Jail, indicated that the performance evaluations "may have been completed and didn't make it into the personnel file or they may not have been completed." Doc. 48-10, p. 82:7-9. Plaintiff has not filed a formal motion seeking the relief she requests. Even if the request contained within her opposition brief is considered a motion for the requested relief, she has not demonstrated intentional destruction of evidence. Nor has she shown how the negative inference she requests would alter the outcome of the pending summary judgment motions.

*Doc. 41- Plaintiff's motion in limine for an order granting judicial notice of government records*

In her motion in limine for an order granting judicial notice of government records, Plaintiff requests that the Court take judicial notice of the facts reflected in the following documents: (1) Ruthann Paulus-Bland Social Work License Verification (Doc. 44-9); (2) Ruthann Paulus-Bland Independent Social Work License Verification (Doc. 44-10); (3) William A. Jones Social Work License Verification (Doc. 44-11);[7] and (4) Summit Psychological Associates, Inc. Secretary of State Registration (Doc. 44-12). Doc. 41. Plaintiff's motion in limine is **unopposed and is granted**.

*Doc. 42 – Plaintiff's motion in limine to exclude the expert testimony and affidavit of Ruthann Paulus-Bland*

Ruthann Paulus-Bland, the Assistant Clinical Director of Jail Services for the Summit County Jail, is an employee of Summit Psychological Associates, Inc. Doc. 40-6, p. 1, ¶ 1; Doc. 40-8, p. 12:5-22. Summit Psychological Associates provided mental health services at the Summit County Jail during the period Jordan was incarcerated. Doc. 40-4, p. 2, ¶ 8.

In her motion in limine to exclude expert testimony and the affidavit of Ms. Paulus-Bland, Plaintiff seeks an order finding that Ms. Paulus-Bland is a fact witness and not an expert witness. Doc. 42. Alternatively, if the Court finds that Ms. Paulus-Bland may testify as an expert witness, Plaintiff requests that the Court enter an order setting the reasonable and customary hourly fee that should be paid to Ms. Paulus-Bland. *Id.*

---

[7] The verifications show that Ms. Paulus-Bland was an LSW (licensed social worker) at the time Jordan was detained in Summit County Jail and received her LISW (licensed independent social worker) license in May 2017. Doc. 44-9, Doc. 44-10; *see also* Doc. 40-8, pp. 139:15-140:6 (Ms. Paulus-Bland deposition testimony, indicating she received her LISW in May 2017). The verifications also show that Mr. Jones is an LSW. Doc. 44-11. During her deposition, Ms. Paulus-Bland explained that, in Ohio, an LSW is authorized to treat mental and emotional disorders but not without supervision by an independent social worker or LPC. Doc. 40-8, p. 138:14-23.

In response, Defendants contend that Plaintiff's motion is premature because no trial date has been set; Defendants do not rely on opinions expressed in Ms. Paulus-Bland's affidavit, only her factual assertions; and, if the matter proceeds forward to trial, Defendants will seek to qualify Ms. Paulus-Bland to testify in the dual capacity of fact and expert witness. Doc. 46. Since Defendants have represented that, at this stage of the proceedings, they are not relying on expert opinions expressed in Ms. Paulus-Bland's affidavit, Plaintiff's motion to exclude Ms. Paulus-Bland as an expert witness is premature and is **denied**.

With respect to Plaintiff's request that the Court set a reasonable and customary hourly fee for Ms. Paulus-Bland's deposition and preparation time, the Court finds that expert fees are not warranted for Ms. Paulus-Bland's deposition.[8]

### Doc. 52 – Plaintiff's motion to strike portions of Ruthann Paulus-Bland's affidavit

In her motion to strike portions of Ms. Paulus-Bland's affidavit submitted in support of Defendants' opposition to her motion for partial summary judgment, Plaintiff argues that paragraphs 5 and 7 of the affidavit and the phrase "that ensures regulatory compliance as well as maintaining quality service" in paragraph 12 should be stricken because the statements contradict Ms. Paulus-Bland's prior deposition testimony and/or are conclusory. Doc. 52.

Paragraph 5 reads:

> Prior to my licensure as an Licensed Independent Social Worker, Ms. Nicolazzo and Dr. Walsh provided clinical supervision, pursuant to OAC 4757-23-01(B), of social workers employed by Summit Psychological Associates. [Doc. 50-1, p. 1, ¶ 5]

Plaintiff argues that Paragraph 5 contradicts earlier deposition testimony wherein Ms. Paulus-Bland identified herself as providing "clinical supervision" in 2015 and 2016. Doc. 52, pp. 3-4.

---

[8] In her motion, Plaintiff states that payment was issued to Ms. Paulus-Bland for an attendance fee of $40.00 per day and mileage. Doc. 42, p. 3, n. 1.

Plaintiff also argues that paragraph 5 should be stricken because it contains an impermissible conclusory statement. Doc. 52, pp. 4-5.

Paragraph 7 of Ms. Paulus-Bland's affidavit reads:

> The social workers, psychologists, and psychiatrists employed by Summit Psychological Associates work collaboratively to deliver services and fulfill regulatory requirements. [Doc. 50-1, p. 1, ¶ 7]

Plaintiff argues that paragraph 7 is conclusory. Doc. 52, pp. 5-6.

The underlined portion of paragraph 12, excerpted below, is the phrase that Plaintiff requests be stricken as an impermissible conclusory statement:

> Summit Psychological Associates also has an ongoing quality assurance process. Quality assurance is headed by Dr. Deborah Walsh and is an open-ended process that ensures regulatory compliance as well as maintaining quality service. Bi-monthly meetings are held with the quality assurance committee to address issues as they arise. The meetings are documented with minutes that may contain confidential client and staff information.

Doc. 52, p. 6; Doc. 50-1, p. 2, ¶ 12 (emphasis supplied).

The Court finds that Plaintiff has not demonstrated a basis upon which to strike paragraphs 5 and 7 or the phrase "that ensures regulatory compliance as well as maintaining quality service" in paragraph 12 of Ms. Paulus-Bland's affidavit and therefore Plaintiff's motion to strike is **denied**. Moreover, as discussed below, even if the challenged paragraphs or portions thereof were stricken that would not change the outcome of the motions for summary judgment.

## II.      Background

### A.  October 2, 2015 – Jordan's arrest and intake at Summit County Jail

Jordan, a 63-year-old white male, was arrested on October 2, 2015, following issuance of a secret indictment alleging six counts of rape and three counts of gross sexual imposition involving a preteen female over a three-year period. Doc. 1, p. 9, ¶¶ 31-32. On October 2, 2015, after Jordan was transported to Summit County Jail, a Summit County Jail deputy noted on an

initial health screening form in the "deputy's opinion" section that Jordan did not have a medical problem that needed medical attention; his behavior was "calm"; his behavior did not suggest a suicide risk or that he was a danger to others; Jordan did not state he was suicidal; Jordan was not placed in suicide precaution; and behavioral health services was not notified regarding Jordan. Doc. 1, p. 10, ¶ 36; Doc. 1-2. The form contains a separate "mental health evaluation" section that was not completed. *Id.*

Also on October 2, 2015, Kimberly Croyle, RN, an employee of Advanced Correctional Healthcare[9] who worked at the Summit County Jail, conducted an initial health screening. Doc. 1, pp. 10-11, ¶ 38; Doc. 1-3; Doc. 40-3, p. 1, ¶ 3. Nurse Croyle's entries into the computer-generated initial health screening form were based on information Jordan relayed to her. Doc. 40-3, p. 1, ¶¶ 3-5. Jordan reported no history of mental health/substance abuse treatment or recent suicidal ideation and he denied a history of suicide ideation or suicide attempts. Doc. 40-3, p. 3. The form indicates a history of suicide attempts in his family, with notations of "mother" and "yrs ago." Doc. 40-3, p. 3. He reported drinking four beers three times per week. Doc. 40-3, p. 3. Jordan reported a prior aneurysm and history of seizures. *Id.* Jordan's blood pressure was elevated but he did not report a history of elevated blood pressure. Doc. 40-3, p. 1, ¶ 5. Jordan's vitals were monitored for three days and, as part of that monitoring, Jordan's blood pressure was checked. *Id.* Jordan's medications included Brimonidine, Lisinopril, Zocor, Phenobarbital, and Dilantin. *Id.*; Doc. 40-3, pp. 6-11. Jordan did not report being prescribed psychotropic medication. Doc. 40-3, p. 1, ¶ 5. Nurse Croyle did not feel that Jordan met the criteria for a diagnostic assessment. Doc. 40-3, p. 1, ¶ 4. The screening form indicates that

---

[9] At the time Jordan was incarcerated, Advanced Correctional Healthcare provided medical services at the Summit County Jail. Doc. 40-4, pp. 1-2, ¶ 7.

general population housing was recommended and there was no referral to behavioral health but the screening form also notes an order for mental health referral was entered. Doc. 40-3, pp. 3, 4. Ms. Paulus-Bland indicated that the mental health referral was subsequently cancelled by Nurse Croyle.[10] Doc. 40-8, pp. 33:17-34:8.

**B. October 14, 2015, transfer to medical pod and assessment**

On October 14, 2015, Summit County Jail deputy Jason Hart contacted nursing to inform them that he was moving Jordan from a "max pod" where offenders with violent charges are placed to the medical pod 1B. Doc. 40-7, p. 1, ¶¶ 2-3; Doc. 40-3, p. 2, ¶ 6; Doc. 40-3, p. 19. There were "concerns that [Jordan] was cutting in front of other inmates in line as well as his history of a brain aneurism." Doc. 40-3, p. 2, ¶ 6; *see also* Doc. 40-3, p. 19.

Also on October 14, 2015, William Jones[11] of Summit Psychological Associates, Inc., completed a diagnostic assessment. Doc. 1, p. 12, ¶ 44; Doc. 1-7; Doc. 40-6, p. 2, ¶¶ 8, 11, 13. Mr. Jones listed Jordan's "current mental health issue" as depressed and anxious. Doc. 1-7, p. 2. Jordan's symptoms included being sad and worried. *Id.* Jordan relayed that he had never been in trouble before; it was his first time in jail; and he could not sleep. *Id.* Jordan denied any homicidal or suicidal ideation but indicated he was depressed and anxious because he had never been in jail before. *Id.* Jordan relayed he was having a hard time adjusting to being in jail. *Id.* Jordan was willing to deal with the jail stressors and was open to weekly counseling. *Id.* Mr.

---

[10] In her discussion of the relevant facts, Plaintiff asserts that Defendants "cannot obscure Mr. Jordan's risk of suicide by now claiming this referral was 'cancelled[]'" and asserts that it conflicts with other documentation showing entry of the order and mental health encounter on October 15, 2015. Doc. 48, pp. 10-11. Plaintiff also states that, if the referral was cancelled "it further demonstrates Defendants' systemic failures, lack of oversight and callous disregard for the mental health of inmates." Doc. 48, p. 11. Plaintiff has not shown how such a conflict, if any, is material with respect to the motions for summary judgment.

[11] Ms. Paulus-Bland supervised Mr. Jones during the time Jordan was in the Summit County Jail. Doc. 40-6, p. 2, ¶ 11.

Jones informed Jordan to KITE[12] if he had further mental health needs/concerns.  *Id.*

When asked by Mr. Jones about his mental health history, Jordan denied any current or prior mental health treatment or drug and alcohol treatment.  Doc. 1-7, p. 3.  He relayed that he had been hospitalized the prior year at St. Thomas "due to making a sarcastic statement about suicide[.]"  *Id.*; *see also* Doc. 40-6, p. 3, ¶ 16.  He denied, however, any recent or prior suicide attempts or self-injurious behaviors.  *Id.*.  Jordan relayed that his brother had committed suicide several years prior.  Doc. 1-7, p. 3.  Jordan did not appear to feel unusually embarrassed or ashamed; he did not express feelings of helplessness or hopelessness; he was not crying nor did he show signs of emotional flatness; he did not appear overly anxious, afraid, or angry; he was not acting or talking in a strange manner; he expressed no thoughts of killing himself and did not have a suicide plan; he denied current psychotropic medications; and he denied recent or prior homicidal behaviors.  *Id.*; Doc. 40-6, p. 3, ¶ 17.  Jordan's reported medical history included brain aneurysm and difficulty hearing.  Doc. 1-7, p. 3.  Jordan reported drinking five to eight beers per month.  *Id.*

Mr. Jones diagnosed Jordan with adjustment disorder with mixed anxiety and depression.  Doc. 1-7, p. 6; Doc. 40-6, p. 3, ¶ 19.  Mr. Jones recommended that Jordan participate in weekly counseling.  Doc. 1-7, pp. 2, 6; Doc. 40-6, p. 3, ¶ 20.  Jordan was to KITE if he wanted the counseling services.  Doc. 1-7, p. 2, Doc. 40-6, p. 3, ¶¶20-21, Doc. 40-6, p. 4, ¶¶ 26-27, Doc. 40-8, pp. 86:20-87:8.  Jordan did not participate in weekly counseling and did not request mental health services while at the Summit County Jail.  Doc. 40-6, p. 4, ¶ 29; Doc. 40-8, p. 89:6-11.

---

[12] "In US prison slang, a *kite* is a message or note[.]"  *See* https://www.dictionary.com/e/slang/kite/ (last visited 3/10/2020).  An inmate at Summit County Jail may "request assistance by submitting a mental health KITE to Behavioral Health Staff."  Doc. 40-6, p. 4, ¶ 26.

### C. January 3, 2016, assessment

Mr. Jones saw Jordan on January 3, 2016. Doc. 1-8; Doc. 40-6, p. 2, ¶ 8; Doc. 40-6, p. 4, ¶ 28.[13] Behavioral health progress notes from that visit reflect that Mr. Jones observed that Jordan was mildly unkempt; he was cooperative; his eye contact was normal; his mood and affect were normal; his depression was moderate; his anxiety was mild; his affect was full; his anger was severe; his speech was clear; his thought process was intact; he had no memory disturbances; and his judgment and insight were fair. Doc. 1-8, pp. 2-3. Jordan denied any homicidal/suicidal ideation and relayed that he was taking it one day at a time. Doc. 1-8, p. 3; Doc. 40-6, p. 4, ¶ 28. Jordan relayed that he was scheduled to go back to court in a few weeks. Doc. 1-8, p. 3. Mr. Jones observed that Jordan was future oriented, cooperative and directable. *Id.* Jordan relayed that he was happy that his wife was being supportive. *Id.* Recommendations included general population housing and follow up as needed. *Id.* Mr. Jones informed Jordan that he should KITE if he had any further mental health needs/concerns. *Id.*

### D. February 12, 2016, suicide

On February 12, 2016, Jordan committed suicide by using bedding to hang himself in his cell. Doc. 1, ¶ 64. Before the suicide, at 11:13 a.m., Deputy Steven Scofield ("Scofield") passed out meals on pod 1B. Doc. 40-14, pp. 1-2, ¶ 5. Scofield noted that no one on pod IB refused lunch. *Id.* Scofield had worked on pod IB on different occasions, including on November 6, 2015, December 23 and 27, 2015, January 21, 2016, February 6, 2016, and February 12, 2016. Doc. 40-14, p. 2, ¶ 6. Scofield indicated that, "[a]t no time did Wayne Jordan appear despondent or depressed. He never requested any services or assistance from me or in my presence." *Id.*

---

[13] The reference to 2018 at Doc. 40-6, p. 4, ¶ 28 as the year in which Mr. Jones saw Jordan on January 3 is considered a typographical error since Jordan's death occurred in 2016.

Scofield performed a security round at 11:27 a.m. and at 11:40 a.m. the meals were taken out of the pod. Doc. 40-14, pp. 1-2, ¶ 5. At 11:47 a.m., the inmates were locked in their cells so that staff could start to eat lunch. *Id.* At 11:51 a.m.,[14] Scofield conducted a key tour and noted that all doors were locked and secure. *Id.*

Pod 1B was not Deputy Trunko's usual pod. Doc. 40-15, p. 2, ¶ 1. On occasion, Trunko performed tours or rounds on Pod 1B. *Id.* Trunko never spoke with Jordan and Jordan never asked Trunko for assistance. Doc. 40-15, p. 2, ¶ 17. Trunko recalls he would give Jordan a thumbs up on occasion and Jordan would return the thumbs up. *Id.*

On February 12, 2016, Trunko was working in Pod 1A but, due to lunch breaks, Trunko conducted the security round for Scofield on pod IB at approximately 12:15 p.m.[15] Doc. 40-15, p. 1, ¶¶ 4-5. Trunko observed Jordan during the security round and saw nothing that gave him any cause to be concerned regarding Jordan's welfare. *Id.* at p. 1, ¶ 5. Later, Trunko assisted Deputy Brady with a key tour of pod 1B. *Id.* at p. 1, ¶ 6. During that key tour, at approximately 12:33 p.m., Trunko looked into Jordan's cell and observed him lying on his bunk with his head on the bunk – he was not moving and he had a bluish color to his face. *Id.* Trunko "immediately called central control on [his] radio to have Wayne Jordan's cell door opened and for medical staff to respond." *Id.* at p. 1, ¶ 7. Trunko estimated that it took less than a minute for the door to open. *Id.* at p. 2, ¶ 8. Once the door opened, Trunko checked the cell to confirm it was safe for him and medical staff. Doc. 40-15, p. 2, ¶ 9; Doc. 40-16, pp. 28:1-7, 28:18. Defendant Trunko recalls medical staff arriving shortly ("within seconds"; "within moments")

<hr>

[14] The Medical Examiner, County of Summit – Report of Investigation ("Report of Investigation") indicates that Scofield conducted a key tour at 11:52 a.m. Doc. 40-18, p. 1.

[15] The Report of Investigation does not reference a security round at 12:15 p.m. *See* Doc. 40-18. The 12:15 p.m. security round is noted on the Daily Log Search Results for pod 1B on February 12, 2016. Doc. 40-4, p. 2, ¶ 11; Doc. 40-4, p. 11.

after he entered Jordan's cell.  Doc. 40-15, p. 2, ¶ 9; Doc. 40-16, p. 29:14-18.  Trunko recalls

checking Jordan for a pulse but could not recall exactly when he did so or whether Jordan had a

pulse when he checked.  Doc. 40-15, p. 2, ¶ 9; Doc. 40-16, p. 27:15-18; Doc. 40-16, p. 28:8-15;

Doc. 40-16, p. 29:3-5, 19-21.  Trunko assisted medical staff with moving Jordan and, while

moving him, it was discovered that the blanket that was pulled up around Jordan's neck was

covering a sheet that had been tied to his bunk and around his neck.  Doc. 40-15, p. 2, ¶ 10, Doc.

40-16, pp. 30:11-31:7.  The sheet that had been covered by the blanket was twisted and tight

around Jordan's neck.  Doc. 40-15, p. 2, ¶ 10.  Because of how tight the sheet was, a cutting tool

had to be retrieved from the security desk.  *Id.* at p. 2, ¶ 12, Doc. 40-16, p. 30:11-19.[16]  Once the

cutting tool was obtained, Trunko assisted security staff in cutting the sheet.  Doc. 40-15, p. 2, ¶

12, Doc. 40-16, p. 30:11-19.  Once the sheet was removed, medical staff moved Jordan to the

floor and commenced resuscitation efforts.  *Id.* at p. 2, ¶ 13.  At approximately 12:38 p.m., the

Akron Fire Squad arrived on scene and took over.  *Id.* at p. 2, ¶ 15.

Jordan was pronounced dead at 12:54 p.m., the cause of death being listed as asphyxia

due to hanging.  Doc. 1-1, pp. 3, 4; Doc. 40-18, pp. 2, 3.

### E.  Observations of Jordan by non-jail personnel

*Mrs. Jordan*

Mrs. Jordan indicated that the only time she considered her husband to be suicidal was in

April 2015, months before his incarceration, when he ended up at St. Thomas.  Doc. 40-5, pp.

32:3-6, 37:19-38:15, 74:8-12.  During his incarceration, Jordan spoke with his wife often on the

telephone.  *See e.g.,* Doc. 40-10; Doc. 40-11.  When asked whether Jordan ever indicated he was

considering suicide during the time he was incarcerated, Mrs. Jordan responded, "Oh.  No, he

---

[16] 911 Rescue Tools are securely stored on each of the six housing units in the security/first aid cabinet and in
central control.  Doc. 40-12, p. 1, ¶ 4; Doc. 40-12, p. 2.

never -- when he was in jail, he never said anything about suicidal, he was going to commit suicide." Doc. 40-5, p. 74:2-7, 13-20. Mrs. Jordan also indicated that no one ever told her that Jordan said he was going to commit suicide while he was incarcerated. Doc. 40-5, pp. 74:23-75:7. Mrs. Jordan did not contact anyone at Summit County Jail regarding her husband's mental or physical health. Doc. 40-5, p. 50:1-12; Doc. 40-5, p. 79:14-24. She believed that Summit County Jail knew Jordan was sick because he was moved to a medical unit and he was receiving his medicine. Doc. 40-5, pp. 79:24-81:7. When Mrs. Jordan was asked about the paragraph in the Complaint stating that Jordan's family made the choice to leave him in pretrial detention because they believed he would be safer there under constant supervision than if he was released into the community, she explained she was worried "because of his state of mind, because his brother committing suicide, and his mother tried, and then there's Wayne, and he was -- his mind was all messed up anyhow that I just knew he would do something, or I would have let him out, if he would have been normal, but be wasn't." Doc. 40-5, pp. 81:20-82:10.

*Robert L. Byrnes, Ph.D.*

Following a court-ordered competency evaluation conducted by Lynn A. Luna Jones, Ph.D., ABPP on December 11, 2015, (Doc. 40-9),[17] Jordan's defense counsel contacted Dr. Robert L. Byrnes, Ph.D., to perform a second competency evaluation (Doc. 40-2, pp. 14:1-5, 18:8-12, 22:21-23:5).[18] Because of Jordan's death, Dr. Byrnes was not able to complete his evaluation and was unable to locate notes from his meetings with Jordan. Doc. 40-2, pp. 68:1-7, 73:18-74:3. For purposes of conducting the competency evaluation, Dr. Byrnes personally met

---

[17] In her report, Dr. Jones stated it was her opinion that Jordan did "not have a mental condition or defect and he currently underst[ood] the nature and objective of the legal proceedings against him[]" and he was "capable of adequately assisting in his defense." Doc. 40-9, p. 8.

[18] For this case, Dr. Byrnes prepared an expert report that is dated April 8, 2019. Doc. 44-13.

with Jordan on January 11 and January 22, 2016. Doc. 40-2, p. 47:2-25. Dr. Byrnes testified

that he had no evidence to indicate that Jordan attempted suicide prior to February 12, 2016.

Doc. 40-2, p. 37:6-16. Following his meetings with Jordan at the Summit County Jail, Dr.

Byrnes did not relay to jail staff concerns about Jordan's mental health or his being a suicide

risk. Doc. 40-2, pp. 49:14-25, 50:9-16. When asked about whether he had communicated any

concerns to jail staff regarding Jordan, Dr. Byrnes added that it was not his role to communicate

with jail staff. Doc. 40-2, p. 49:22. However, Dr. Byrnes did state that, if Jordan had told him

during one of his meetings that he was suicidal and thinking about ending his life, he would have

informed the staff. Doc. 40-2, pp. 50:17-51:2.

*Dan Gourley*

Dan Gourley, a volunteer in the Summit County Jail who aided inmates in studying the

Bible, met with Jordan during Jordan's pretrial detention approximately 12 times. Doc. 40-13, p.

1, ¶¶ 2-3. The last time that Mr. Gourley met with Jordan prior to Jordan's death was on

February 10, 2016. *Id.* at ¶ 4. Their meeting lasted approximately 30 minutes. *Id.* at ¶ 5.

Following his bible study meeting, Mr. Gourley met briefly with Mrs. Jordan. *Id.* at ¶ 6. Mr.

Gourley recalls nothing about Jordan's demeanor during their meeting that would have caused

him to alert jail staff. *Id.* at ¶ 7. Mr. Gourley was "shocked when [he] learned [Jordan] took his

own life." *Id.* at ¶ 8.

*Other inmates*

As part of the investigation regarding Jordan's death, inmates in pod 1B were

interviewed. Doc. 49-1, pp. 6-10. Included in some of the inmates' statements[19] were

observations of Jordan during the few weeks prior to and on the day of his suicide that he was

---

[19] The statements are not attested to.

nervous, appeared upset, was freaking out about his trial, was on the telephone and appeared

upset; and was depressed and worried. *Id.* However, some inmates reported observing nothing

unusual; being unaware of any suicidal thoughts or intentions; and being unaware of issues or

conflicts that Jordan had with any inmates or staff. *Id.*

### III.    Law and Analysis

#### A.  Summary Judgment Standard of Review

Rule 56 of the Federal Rules of Civil Procedure provides that "[t]he court shall grant

summary judgment if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The movant

"bears the initial responsibility of informing the district court of the basis for its motion,

identifying those portions of the pleadings, depositions, answers to interrogatories, and

admissions on file, together with affidavits, if any, which it believes demonstrates the absence of

a genuine issue of material fact." *Celotex Corp. v. Catrett¸* 477 U.S. 317, 323 (1986) (internal

quotations omitted).

After the moving party has carried its initial burden of showing that there are no genuine

issues of material fact in dispute, the burden shifts to the non-moving party. *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986). "Inferences to be drawn from

the underlying facts . . . must be viewed in the light most favorable to the party opposing the

motion." *Id.* at 587 (internal quotations and citations omitted). However, the non-moving party

"must do more than simply show that there is some metaphysical doubt as to the material facts."

*Matsushita*, 475 U.S. at 586. The non-moving party must present specific facts that demonstrate

there is a genuine issue of material fact for trial. *Matsushita,* 475 U.S. at 587. "The 'mere

possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th

Cir. 1986).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "A genuine issue for trial exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Muncie Power Products, Inc. v. United Technologies Automotive, Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 248). Thus, for a plaintiff to avoid summary judgment, "there must be evidence on which a jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252. Accordingly, in determining whether summary judgment is warranted, the court asks "whether there is evidence upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed." *Id.* (emphasis in original) (internal citations omitted). The legal standard applied to cross-motions for summary judgment does not differ from the standard applied when one party to the litigation files a summary judgment motion. *Ferro Corp. v. Cookson Group, PLC*, 585 F.3d 946, 949 (6th Cir. 2009). Each cross-motion must be evaluated on its own merits, with the court viewing all facts and reasonable inferences in the light most favorable to the nonmoving party. *See Appoloni v. U.S*., 450 F.3d 185, 189 (6th Cir. 2006).

### B. Claims against Defendant Trunko in his individual capacity

#### 1. *§ 1983 deliberate indifference claim (first cause of action)*

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *Gray v. City of Detroit*, 399 F.3d 612, 615 (6th Cir. 2005) (quoting *West v. Atkins,* 487 U.S. 42, 48, 108 S. Ct. 2250, 101 L.Ed.2d 40

(1988)); *Watkins v. City of Battle Creek*, 273 F.3d 682, 685 (6th Cir. 2001) ("To establish a claim under 42 U.S.C. § 1983, a plaintiff must 'identify a right secured by the United States Constitution and the deprivation of that right by a person acting under color of state law.'") (quoting *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1992); *see also Jerauld v. Carl*, 405 Fed. Appx. 970, 974-975 (6th Cir. Dec. 30, 2010).

Plaintiff alleges a violation of Jordan's constitutional rights, arguing Defendants violated his right to be free from deliberate indifference to a serious medical need, the right to be free from cruel and unusual punishment and the right to reasonable medical treatment while detained so as not to unnecessarily and wantonly inflict pain. Doc. 1, p. 23, ¶ 85, Doc. 12, pp. 8-12 (citing both Eighth and Fourteenth Amendment protections).

Defendants argue that Defendant Trunko is entitled to qualified immunity. "[Q]ualified immunity shields officials from civil liability if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Richmond v. Huq*, 885 F.3d 928, 947 (6th Cir. 2018) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). If qualified immunity applies, it is "an immunity from suit rather than just a mere defense to liability[.]" *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.E.2d 565 (2009). The two steps of the qualified immunity analysis may be addressed in any order but, if both steps are not satisfied, then qualified immunity shields an individual government officer from civil damages. *Courtright v. City of Battlecreek*, 839 F.3d 513, 518 (6th Cir. 2016). Defendants do not contend that the law that "prison officials who have been alerted to a prisoner's serious medical needs are under an obligation to offer medical care to such a prisoner[,]" (*Comstock*, 273 F.3d at 702 (citing *Danese*, 875 F.2d at 1244)), was not clearly established at the time of Jordan's suicide. Thus, the focus of the Court's inquiry is on the first

prong of the qualified immunity analysis, i.e., "whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated." *Richmond*, 885 F.3d at 947. "Ultimately, the plaintiff bears the burden of showing that an officer is not entitled to the defense of qualified immunity." *Courtright*, 839 F.3d at 518.

The Eighth Amendment prohibits "deliberate indifference to serious medical needs of prisoners [because it] constitutes 'unnecessary and wanton infliction of pain.'" *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (internal citation omitted). Thus, "[a] prisoner's Eighth Amendment right is violated when prison doctors or officials are deliberately indifferent to the prisoner's serious medical needs." *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001) (citing *Estelle*, 429 U.S. at 103). "[P]rison officials who have been alerted to a prisoner's serious medical needs are under an obligation to offer medical care to such a prisoner." *Comstock*, 273 F.3d at 702 (citing *Danese*, 875 F.2d at 1244).

Jordan was a pretrial detainee. The Sixth Circuit, along with "other circuits, have held that the Eighth Amendment cruel and unusual punishment analysis used by the Court in *Estelle* . . . is applicable to pretrial detainees." *Danese v. Asman*, 875 F.2d 1239, 1243 (6th Cir. 1989) (full internal citation omitted) (discussing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979) wherein the Supreme Court concluded that, "under due process of law, pretrial detainees may not be punished because they have not yet been judged guilty."); *see also Gray*, 399 F.3d at 615-616 ("While the Eighth Amendment does not apply to pre-trial detainees, the Due Process Clause of the Fourteenth Amendment does provide [pre-trial detainees] with a right to adequate medical treatment that is analogous to prisoner's rights under the Eighth Amendment.") (citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983); *Watkins v. City of Battle Creek*, 273 F.3d 682, 685-86 (6th Cir. 2001)).

With respect to a deliberate indifference claim under the Eighth Amendment, the Sixth

Circuit has explained that:

> An Eighth Amendment claim has two components, one objective and one subjective. To satisfy the objective component, the plaintiff must allege that the medical need at issue is "sufficiently serious." *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). To satisfy the subjective component, the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk. *Farmer,* 511 U.S. at 837, 114 S.Ct. 1970. Emphasizing the subjective nature of this inquiry, the Supreme Court has noted that "an official's failure to alleviate a significant risk that *he should have perceived but did not,* while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Id.* at 838, 114 S.Ct. 1970 (emphasis added).

*Comstock*, 273 F.3d at 702-703.

"[T]o satisfy the objective component of an Eighth Amendment claim, the plaintiff must

allege that the medical need at issue is 'sufficiently serious.'" *Comstock*, 273 F.3d at 703

(quoting *Farmer*, 511 U.S. at 834). Here, Plaintiff alleges that Mr. Jordan's medical emergency

and psychological needs, including suicidal tendencies, were the medical needs at issue. Doc. 1.

The Sixth Circuit has held that "a prisoner's 'psychological needs may constitute serious medical

needs, especially when they result in suicidal tendencies.'" *Id.* (quoting *Horn v. Madison Cty.*

*Fiscal Ct.*, 22 F.3d 653, 660 (6th Cir. 1994).

The subjective component requires that a plaintiff "show that (1) the official being sued

subjectively perceived facts from which to infer substantial risk to the prisoner, (2) that he did in

fact draw that inference, and (3) that he disregarded that risk." *Jerauld*, 405 Fed. Appx. at 975-

976 (quoting *Comstock*, 273 F.3d at 703 (internal quotations omitted). When a plaintiff alleges

"deliberate indifference [he] must show more than negligence or the misdiagnosis of an ailment .

.. [but] a plaintiff need not show that the official acted for the very purpose of causing harm or

with knowledge that harm will result." *Comstock*, 273 F.3d at 703 (citing *Estelle*, 429 at 206;

*Farmer*, 511 U.S. at 835; *Horn*, 22 F.3d at 660) (internal quotations omitted). Thus, "deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." *Id.* (citing *Farmer*, 511 U.S. at 836).

Relying on *Kingsley v. v. Hendrickson*, — U.S. —, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015), Plaintiff contends that, since Jordan was a pretrial detainee, the subjective intent element need not be satisfied. Doc. 43, pp. 21-23; Doc. 48, p. 14, n. 2; Doc. 48, pp. 22-23. "The Supreme Court in *Kingsley* . . . held that a pretrial detainee's Fourteenth Amendment excessive force claim need only meet the objective component of showing that the 'force purposely or knowingly used against him was objectively unreasonable.'" *Richmond v. Huq*, 885 F.3d 928, 938, n. 3 (6th Cir. 2018)) (quoting *Kingsley*, 135 S.Ct. at 2473). Since the Supreme Court's 2015 decision in *Kingsley*, whether a pretrial detainee is required to satisfy the subjective intent element has been a question subject to some debate.

The Sixth Circuit, noting that it had "not yet considered whether *Kingsley* similarly abrogate[d] the subjective intent requirement of a Fourteenth Amendment deliberate indifference claim[,]"observed "that this shift in Fourteenth Amendment deliberate indifference jurisprudence call[ed] into doubt whether the" detainee had to satisfy the subjective component. *Richmond*, 885 F.3d at 938, n. 3. However, notwithstanding the court's observations, the Sixth Circuit proceeded to apply the Eighth Amendment standard. *Id.* at 938, 939. And, as recently as January 22, 2020, when presented with an argument that *Kingsley's* objective reasonableness standard applied to a pretrial detainee deliberate indifference claim, the Sixth Circuit found it unnecessary to address that issue and therefore left "the *Kingsley* question for another day." *Martin v. Warren County, Kentucky*, -- Fed. Appx. --, 2020 WL 360436, 4, n. 4 (6th Cir. Jan. 22, 2020) (unpublished). Other cases within the Sixth Circuit have "applied the Eighth Amendment

[deliberate indifference] standard to inadequate-medical-care claims brought by pretrial detainees even after *Kingsley*." *Gallmore v. York*, 2018 WL 1737120, * 8 (E.D. Mich. Apr. 4, 2018); *Phelps v. Tuscarawas County, Ohio/Tuscarawas County Board of Commissioners*, 2018 WL 2234917, * 8, n. 11 (N.D. Ohio May 16, 2018) (noting that the Sixth Circuit had not yet determined whether *Kingsley* abrogated the subjective component of a Fourteenth Amendment deliberate indifference claim).

Although there has been debate as to the application of *Kingsley* to deliberate indifference claims, Plaintiff has not demonstrated that the Sixth Circuit has determined that *Kingsley* eliminated the subjective component of an Eighth Amendment deliberate indifference claim. *See Martin*, 2020 WL 3604363, 4, n. 4 ("leav[ing] the *Kingsley* question for another day[]"). Thus, in resolving the pending motions, the Court applies both the objective and subjective components of the Eighth Amendment deliberate indifference standard as have other courts since *Kingsley*.

Plaintiff argues that Defendant Trunko was deliberately indifferent to Jordan's serious medical needs because adequate precautions were not taken to prevent Jordan from committing suicide and, once Defendant Trunko discovered Jordan not moving and with a bluish color to his face, he was deliberately indifferent to Jordan's serious medical needs.

The Sixth Circuit has observed, "the right to medical care for serious medical needs does <u>not</u> encompass the right to be screened correctly for suicidal tendencies." *Comstock*, 273 F.3d at 702. (internal quotations omitted) (emphasis supplied); *Gray*, 399 F.3d at 616 (indicating that "there is no general constitutional right of detainees to receive suicide screenings or be placed in suicide safe facilities, unless the detainee has somehow demonstrated a strong likelihood of committing suicide[]") (discussing *Barber v. City of Salem, Ohio*, 953 F.2d 232, 237 (6th Cir.

1992) and citing *Danese*, 875 F.2d at 1244 and *Crocker v. County of Macomb*, 199 Fed Appx.

718, 724 (6th Cir. 2005) (unpublished)).  Also, the Supreme Court has held "no decision of this

Court establishes the right to the proper implementation of adequate suicide prevention

protocols."  *Taylor v. Barkes*, 575 U.S. 822, 135 S.Ct. 2042, 2044, 192 L.Ed.2d 78 (2015); *see*

*also Broughton v. Premier Health Care Services, Inc.*, 656 Fed. Appx. 54, 57 (6th Cir. July 15,

2016) (quoting *Comstock*, 273 F.3d at 703 and *Taylor*, 135 S.Ct. at 2044).

The Sixth Circuit has indicated that the proper inquiry for determining liability under §

1983 for a pretrial detainee's suicide is "whether the decedent showed a strong likelihood that he

would attempt to take his own life in such a manner that failure to take adequate precautions

amounted to deliberate indifference to the decedent's serious medical needs."  *Russell v. Davis*,

522 Fed. Appx. 314, 317 (6th Cir. Apr. 10, 2013) (quoting *Barber v. City of Salem*, 953 F.2d

232, 239-240 (6th Cir. 1992)).  The subjective component of deliberate indifference requires that

a plaintiff "show that (1) the official being sued subjectively perceived facts from which to infer

substantial risk to the prisoner, (2) that he did in fact draw that inference, and (3) that he

disregarded that risk."  *Jerauld*, 405 Fed. Appx. at 975-976 (quoting *Comstock*, 273 F.3d at 703

(internal quotations omitted).

To prevail on Defendants' motion for summary judgment, Plaintiff must demonstrate that

there is "evidence on which a jury could reasonably find for the plaintiff[]" on her claim that

Defendant Trunko was deliberately indifferent to Jordan's serious medical needs.  *Anderson*, 477

U.S. at 252.  As explained below, Plaintiff has not met her burden.

*Defendant Trunko lacked knowledge that there was a strong likelihood that Jordan would attempt to commit suicide*

Plaintiff has failed to demonstrate that the evidence is sufficient to allow a reasonable jury to determine that Defendant Trunko was deliberately indifferent to a known risk that Jordan would likely commit suicide.

Plaintiff contends that Jordan had suicide risk factors, including being a white male, age 63, with physical health concerns (seizure disorder and hemorrhagic stroke), mental health concerns (history of depression), allegations of crimes of a shocking nature, a history of alcohol abuse, and a family history of suicide. Doc. 48, p. 10 (citing Dr. Byrnes' Report (Exhibit 136 (Doc. 44-13) and Ms. Paulus-Bland's deposition (Exhibit 157 (Doc. 44-14, pp. 26, 28)). Plaintiff contends that, in light of these risk factors, Defendants should have drawn the inference that Jordan was a suicide risk. However, as stated by the Supreme Court in *Farmer*, "an official's failure to alleviate a significant risk that *he should have perceived but did not*, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838 (emphasis supplied). For instance, the Sixth Circuit rejected a claim that officials should have been on notice that a detainee was a suicide risk on the basis that a detainee fit a profile of someone more likely to commit suicide, finding that, "[j]ail officials cannot be charged with knowledge of a particular detainee's high suicide risk based solely on the fact that the detainee fits a profile of individuals who purportedly are more likely to commit suicide than those who do not fit the profile in all respects." *Crocker ex rel. Estate of Tarzwell v. County of Macomb*, 119 Fed. Appx. 718, 723 (6th Cir. Jan. 4, 2005).[20]

---

[20] Courts have found no liability even when there is knowledge of prior suicidal thoughts or statements. *See e.g.*, *Soles v. Ingham*, 148 Fed. Appx. 418, 419-420 (6th Cir. 2005) (finding defendants not deliberately indifferent due to their decision to return decedent to general population where decedent had expressed no suicidal thoughts for

Further, as indicated above, "the right to medical care for serious medical needs does not encompass the right to be screened correctly for suicidal tendencies." *Id.* (internal quotations omitted) (emphasis supplied); *Gray*, 399 F.3d at 616. Thus, any claim by Plaintiff that, because of Jordan's general risk factors (assuming arguendo the factors Plaintiff points to are indicative of a greater suicide risk), failure to perform further screening establishes liability by Defendant Trunko under § 1983 is without merit.

Moreover, Plaintiff has presented no evidence to show that Defendant Trunko had *actual* knowledge that Jordan was at serious risk to commit suicide. While Defendant Trunko was aware that Jordan was a white male (Doc. 40-16, pp. 31-32), his only contact with Jordan was during passing rounds[21] (Doc. 40-16, pp. 32-33). Further, Defendant Trunko was not aware of the charges against Jordan; he was not aware that Jordan had a history of alcohol abuse; he was not aware that Jordan had a history of medical problems; he was not aware that Jordan had a seizure disorder; he was not aware that Jordan had a brain aneurysm and stroke that caused significant brain damage; he was not aware that Jordan had memory and speech problems as a result of his stroke; he was not aware that Jordan had a history of mental health illness; he was not aware Jordan had been diagnosed with adjustment disorder with mixed anxiety disorder; he was not aware Jordan had a history of suicidal behavior; he was not aware Jordan had been held in St. Thomas on a psychiatric hold less than a year before his arrest; he was not aware Jordan's brother had committed suicide; he was not aware that it was Jordan's first time in jail or his first

approximately two weeks and exhibited no increased risk for suicide); *Ellis v. Washington Cty., Tenn.*, 80 F.Supp.2d 791, 801 (E.D. Tenn. 1998), *affirmed* 198 F.3d 225, 227 (6th Cir. 1999) (finding defendant entitled to qualified immunity where "the most that [could] be said about [defendant] [was] he knew [decedent] had been suicidal in the recent past.").

[21] Deputy Trunko explained that "passing round" meant "[w]alking through the housing units, looking in to make sure everything appears normal as you make your round by the cells." Doc. 40-16, p. 16:3-8.

arrest; he had not observed whether Jordan was angry; and he was not aware that behavioral health had observed him to have severe anger  (Doc. 40-16, pp. 32-35).

While Jordan relayed to other jail personnel that he had been admitted to St. Thomas almost a year prior to his arrest, there is no evidence that Trunko was aware of that information. Additionally, Jordan was in the Summit County Jail for approximately 4 months with no evidence that he attempted to harm himself prior to his suicide on February 12, 2016.  Even when a defendant has knowledge of a plaintiff's past attempt to harm himself, such knowledge alone is not enough to demonstrate that a defendant knew that the plaintiff was a suicide risk at a later time.  *See e.g.*, *Phelps*, 2018 WL 2234917, * 10; *Ellis v. Washington County, Tenn.*, 80 F.Supp.2d 791, 801 (E.D. Tenn. 1998).

In an apparent attempt to avoid summary judgment in the face of clear evidence showing that Defendant Trunko did not subjectively perceive facts from which to infer a substantial risk that Jordan would commit suicide, Plaintiff points to unattested statements made by inmates as part of a confidential investigation conducted <u>after</u> Jordan's death to argue that the objective factors were so pervasive that there is a material issue of fact precluding summary judgment. Doc. 48, p. 25 (referring to Exhibit 122 (Doc. 49-1)).   Included in some of the inmates' statements were observations of Jordan prior to and on the day of Jordan's suicide that Jordan was nervous, appeared upset, was freaking out about his trial, was on the telephone and appeared upset; and was depressed and worried.  Doc. 48, p. 25.  However, what inmates reported perceiving about Jordan during an investigation following Jordan's death does not demonstrate a genuine issue of material fact as to what Defendant Trunko knew or subjectively perceived on the day of his death.  Further, there is no indication that the inmates who provided those

statements relayed that information to Defendant Trunko. Nor has Plaintiff shown that an individual would have perceived a substantial risk of suicide based on those observations.

### *Defendant Trunko did not disregard a substantial risk to Jordan when he found Jordan in the cell*

Plaintiff also argues that § 1983 liability should be imposed on Deputy Trunko because he was deliberately indifferent to Jordan's serious medical needs by failing to respond adequately when he discovered Jordan in his cell. Plaintiff argues that Deputy Trunko had objective and subjective knowledge of a serious medical condition when he observed Jordan unresponsive in his cell. While the evidence may demonstrate that Defendant Trunko was aware of a serious medical need once he discovered Jordan in his cell, in order to avoid summary judgment, Plaintiff must also demonstrate a genuine issue of material fact exists as to whether Deputy Trunko was deliberately indifferent to a substantial risk of serious harm to Jordan once he was aware of that risk. As indicated herein, deliberate indifference requires a showing of more than negligence. *Comstock*, 273 F.3d at 703; *Martin*, 2020 WL 360436, * 4, n. 4. "[D]eliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." *Id.* (citing *Farmer*, 511 U.S. at 836).

Defendant Trunko argues that he is entitled to qualified immunity because he was not deliberately indifferent to Jordan's serious medical needs. Pod 1B was not Trunko's usual pod. Doc. 40-15, p. 2, ¶ 1. On occasion, Trunko performed tours or rounds on pod 1B. *Id.* Trunko never spoke with Jordan and Jordan never asked Trunko for assistance. Doc. 40-15, p. 2, ¶ 17. Trunko recalls that, on occasion, would give Jordan a thumbs up and Jordan would return the thumbs up. *Id.*

On the day of Jordan's suicide, Trunko was working in Pod 1A but, because of lunch breaks, he conducted the security round for Scofield on pod 1B at approximately 12:15 p.m.

Doc. 40-15, p. 1, ¶¶ 4-5. Trunko observed Jordan during the security round and did not have any cause to be concerned regarding Jordan's welfare. *Id.* at p. 1, ¶ 5. Later, Trunko assisted Deputy Brady with a key tour of pod 1B. *Id.* at p. 1, ¶ 6. During that key tour, at approximately 12:33 p.m., Trunko looked into Jordan's cell and observed him lying on his bunk with his head on the bunk – he was not moving and he had a bluish color to his face. *Id.* Trunko "immediately called central control on [his] radio to have Wayne Jordan's cell door opened and for medical staff to respond." *Id.* at p. 1, ¶ 7. Trunko estimated that it took less than a minute for the door to open. *Id.* at p. 2, ¶ 8. Once the door opened, Trunko checked the cell to confirm it was safe for him and medical staff. Doc. 40-15, p. 2, ¶ 9; Doc. 40-16, pp. 28:1-7, 28:18. Defendant Trunko recalls medical staff arriving shortly ("within seconds"; "within moments") after he entered Jordan's cell. Doc. 40-15, p. 2, ¶ 9; Doc. 40-16, p. 29:14-18. Trunko recalls checking Jordan for a pulse but could not recall exactly when he did so or whether Jordan had a pulse when he checked. Doc. 40-15, p. 2, ¶ 9; Doc. 40-16, p. 27:15-18; Doc. 40-16, p. 28:8-15; Doc. 40-16, p. 29:3-5, 19-21. Trunko assisted medical staff with moving Jordan and, while moving him, it was discovered that the blanket that was pulled up around Jordan's neck was covering a sheet that had been tied to his bunk and around his neck. Doc. 40-15, p. 2, ¶ 10, Doc. 40-16, pp. 30:11-31:7. The sheet that had been covered by the blanket was twisted and tight around Jordan's neck. Doc. 40-15, p. 2, ¶ 10. Because of how tight the sheet was, a cutting tool had to be retrieved from the security desk. *Id.* at p. 2, ¶ 12, Doc. 40-16, p. 30:11-19. Once the cutting tool was obtained, Trunko assisted security staff in cutting the sheet. Doc. 40-15, p. 2, ¶ 12, Doc. 40-16, p. 30:11-19. Once the sheet was removed, medical staff moved Jordan to the floor and commenced resuscitation efforts. *Id.* at p. 2, ¶ 13. At approximately 12:38 p.m., the Akron Fire Squad arrived on scene and took over. *Id.* at p. 2, ¶ 15.

In her opposition brief, Plaintiff argues that Defendant Trunko's credibility is at issue because he provided conflicting testimony regarding what occurred when he discovered Jordan in his cell. Doc. 48, p. 17. She describes the alleged conflicting testimony as follows: In his affidavit, Defendant Trunko states that he "scanned the cell quickly" to make sure the cell was safe and then checked Jordan for a pulse but in his deposition he indicated he did not know if he checked Jordan for a pulse or waited for medical to arrive and he said he had to first make sure Jordan was not engaged in a "ruse to attack" him and had to "assess the situation" with medical services arriving shortly thereafter. *Id.* There is nothing inconsistent about "scanning the cell quickly" and assessing the situation to make sure that there was no ruse to attack him. Further, while Defendant Trunko could not specifically recall during his deposition whether he checked Jordan for a pulse when he entered the cell, Plaintiff has not disputed the evidence that Trunko immediately sought medical attention for Jordan upon seeing Jordan not moving and with a bluish color to his face. Upon discovering Jordan in respiratory distress, Defendant Trunko immediately called central control and medical staff to respond to 1B (Doc. 40-15, pp. 1, ¶ 7; Doc. 40-16, p. 27:11-14) and medical services arrived within moments of his entrance into the cell (Doc. 40-16, p. 29:14-18); *see also* Doc. 40-15, p. 2, ¶ 14 (Deputy Trunko, stating, "During this incident, I moved as quickly as possible to gain access to Mr. Jordan and to provide immediate medical help based on my observation at 12:33 p.m. that he was experiencing a medical emergency." Doc. 40-15, p. 2, ¶ 14).

Plaintiff argues that there are "disputed material issues of facts as to when, exactly, Mr. Jordan was discovered and how long it took Deputy Trunko to respond." Doc. 48, p. 23. She asserts that "[d]eputies at the Summit County Jail have the custom and practice of recording key tours in the Daily Log for pod activity *before* actually conducting key tours[,]" pointing out that

[t]he '1233' key tour when Deputy Trunko discovered Mr. Jordan unresponsive was entered in the Daily Log at 12:27, five minutes before it started[]"[22] and Deputy Trunko's name is not in the Daily Log for this key tour.[23]  Doc. 48, p. 15 (emphasis in original).  Michael Brady, who did the tour with Trunko,[24] is listed on the entry for the 12:27 p.m. key tour.  Doc. 40-14, p. 10.  Deputy Trunko states that, "[a]t approximately 12:33 p.m., while assisting [Deputy Brady] in the key tour, I looked into Wayne Jordan's cell and saw him lying on his bunk, with his head on the bunk.  He was not moving and he had a bluish color to his face."  Doc. 40-15, p. 1, ¶ 6.  Plaintiff argues that, "[w]hen every minute is crucial, whether Mr. Jordan was discovered at 12:27 or 12:33 is significant" and contends that "it is evident that the Defendants purposefully permitted a pattern and practice of inaccurate record keeping that makes it impossible to know when Mr. Jordan was actually observed."  Doc. 48, p. 16.

Plaintiff's argument is a red herring.  The material issues are what Deputy Trunko knew before Jordan's suicide, i.e., did he know there was a strong likelihood Jordan would attempt suicide, and what Trunko did after he found Jordan unresponsive, i.e., did he immediately seek medical help.  On those material issues, there is no genuine issue of fact.  As discussed above, there is no evidence that Deputy Trunko was aware that Jordan was a suicide risk before Trunko found Jordan not moving and with a bluish color to his face.  And Plaintiff has presented no evidence that, when Deputy Trunko observed Jordan unresponsive, Trunko failed to act

---

[22] The manual entry was made before the key tour.  Doc. 40-16, p. 21:10-20; Doc. 48-10, p. 40:22-25, p. 52:10-15.

[23] Plaintiff also argues that the 12:15 p.m. security round showing in the Daily Log for Pod IB for February 12, 2016, (Doc. 40-14, p. 10, Doc. 48-6, p. 6) was not mentioned in investigations (Medical Examiner investigation and confidential investigation) conducted *before* the pending litigation commenced.  (Doc. 48, p. 16).  She contends that the omission of the 12:15 p.m. security round in these two investigations calls into question the reliability of the 12:15 p.m. entry.

[24] Deputy Brady and Deputy Trunko split the round – Deputy Brady was on the top level of Pod 1B and Deputy Trunko was on the bottom level.  Doc. 40-16, p. 21:2-9.

promptly.

Furthermore, a "failure to comply with a statute, administrative rule, or policy does not itself rise to the level of a constitutional violation." *Smith v. Eyke*, 2011 WL 1528155, * 9 (W.D. Mich. Apr. 20, 2011) (citing Sixth Circuit cases, including *Barber*, 953 F.2d at 240).[25] Thus, even if Plaintiff could demonstrate a failure to conduct or log surveillance as required by jail policy, it would not be sufficient to establish a constitutional violation. As discussed above, until Deputy Trunko discovered Jordan unresponsive in his cell, he was not aware of a substantial risk to Jordan. It is his actions in response to a known substantial risk that are material, not what may have occurred before he perceived the substantial risk. Deliberate indifference requires more than negligence; deliberate indifference is akin to reckless disregard. Plaintiff has not presented evidence demonstrating that Deputy Trunko recklessly disregarded a substantial risk to Jordan once he discovered Jordan not moving and with a bluish color to his face.

In summary, Plaintiff has not met her burden of showing that material issues of fact exist that would allow a jury to reasonably determine that Defendant Trunko was deliberately indifferent to Jordan's serious medical needs.

For the reasons discussed herein, Plaintiff has not demonstrated that Trunko violated Plaintiff's constitutional rights. Therefore, Defendant Trunko is entitled to summary judgment on Plaintiff's § 1983 deliberate indifference claim in the first cause of action.

## 2. *State law claims (third and fourth causes of action)*

In the third and fourth causes of actions, Plaintiff alleges that Defendant Trunko acted in

---

[25] See *Barber*, 953 F.2d at 240 ("failure to comply with a state regulation is not itself a constitutional violation[]"); *see also Luckert v. Dodge County*, 684 F.3d 808, 819 (8th Cir. 2012) ("Failure to follow written procedures does not constitute *per se* deliberate indifference.").

a willful, wanton and reckless manner and that his actions and omissions caused Jordan's wrongful death. Doc. 1, pp. 24-25. As it pertains to individual employees of a political subdivision, courts assess the issue of state law immunity under R.C. § 2744.03(A)(6). *Cramer v. Auglaize Acres*, 113 Ohio St.3d 266, 270 (2007); *see also Gattrell v. Utica*, 63 N.E.3d 461, 470 (5th Dist. 2016). Under R.C. § 2744.03(A)(6), "an employee is immune from liability unless the . . . employee's acts or omissions were malicious, in bad faith, or wanton or reckless . . ." *Cramer*, 113 Ohio St.3d at 270. (citing R.C. § 2744.03(A)(6)).

For the reasons more fully explained above in connection with Plaintiff's § 1983 deliberate indifference claim, the Court finds that Plaintiff has not shown that there is evidence upon which a reasonable jury could find that Defendant Trunko's acts or omissions were malicious, in bad faith, or wanton or reckless. *See e.g.*, *Chappell v. City of Cleveland*, 585 F.3d 901, 907, n. 1, 916, n. 3. (6th Cir. 2009) (viewing the state law issues through the lens of the federal qualified immunity analysis and finding defendants were also entitled to immunity from liability in connection with state law claims).

Accordingly, the Court finds that Defendant Trunko is entitled to summary judgment on the state law claims contained in the third and fourth causes of action.

### B. Claims against Summit County

Plaintiff's § 1983 claims against Summit County[26] are for deliberate indifference (first cause of action) and failure to train (second cause of action). Plaintiff seeks summary judgment on the first cause of action, arguing that Summit County is liable under § 1983 for failing to provide mental health services and care to her husband. Doc. 43. Defendants seek summary judgment on the first and second causes of action. Doc. 40.

---

[26] As indicated herein, the second cause of action is also asserted against Defendant Barry in his official capacity, which is equivalent to a claim against Summit County.

Section § 1983 "imposes liability on a government that, under color of some official policy, 'causes' an employee to violate another's constitutional rights." *Monell v. Dept. of Soc. Servs. of City of New York*, 436 U.S. 658, 691-92 (1978).

In *City of Canton, Ohio v. Harris*, the Supreme Court explained that:

> In *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), we decided that a municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue. *Respondeat superior* or vicarious liability will not attach under § 1983. *Id.,* at 694–695, 98 S.Ct. at 2037–38. "It is only when the 'execution of the government's policy or custom ... inflicts the injury' that the municipality may be held liable under § 1983." *Springfield v. Kibbe,* 480 U.S. 257, 267, 107 S.Ct. 1114, 1119, 94 L.Ed.2d 293 (1987) (O'CONNOR, J., dissenting) (quoting *Monell, supra,* 436 U.S., at 694, 98 S.Ct. at 2037–38).

*City of Canton, Ohio v. Harris*, 489 U.S. 378, 385, 109 S. Ct. 1197, 1203, 103 L. Ed. 2d 412 (1989).

Further, the Supreme Court has held that:

> the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.[] This rule is most consistent with our admonition in *Monell,* 436 U.S., at 694, 98 S.Ct., at 2037, and *Polk County v. Dodson,* 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981), that a municipality can be liable under § 1983 only where its policies are the "moving force [behind] the constitutional violation." Only where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983.

*City of Canton*, 489 U.S. at 388–89 (footnote omitted).

In support of her claims against Summit County, Plaintiff contends that the County failed to provide annual suicide prevention training and the training it did provide was inadequate. Doc. 48, p. 26. Plaintiff also contends that Summit County had an "official policy or custom of allowing unsupervised and unqualified social workers to provide mental health services at the Summit County Jail" and that "official policy or custom" "was the moving force behind the

constitutional violation that resulted in Mr. Jordan's death."  Doc. 43, p. 20.  Neither of the

alleged unsupervised and unqualified social workers – Ruthann Paulus-Bland and William Jones

– is named as a defendant in this case.  Relying on Ohio law, Plaintiff asserts that Ms. Paulus-

Bland, who was the mental health coordinator at the Summit County Jail in 2015 and 2016, "was

not qualified to independently diagnose or treat mental or emotional conditions without clinical

supervision" and she "purported to supervise other social workers [Mr. Jones] who were likewise

not licensed to independently diagnose and treat mental or emotional disorders without clinical

supervision."  Doc. 43, pp. 7, 11-12.  She further argues that, "[a]s a direct result of Summit

County's customs and practices, Mr. Jordan and numerous other jail inmates were never

assessed, diagnosed or treated by a qualified mental health professional during 2015 and 2016."

Doc. 43, pp. 7-8.  Plaintiff seeks to hold Summit County liable under § 1983 on the basis that

"[t]hese systematic and pervasive failures to provide mental health services resulted in Mr.

Jordan's death when he committed suicide in his jail on February 12, 2016."  Doc. 43, p. 8.

Defendants argue there can be no municipal liability under § 1983 where there is no

underlying constitutional violation.  Doc. 40, pp. 20-21 (citing *Monell*, 436 U.S. at 691-92).

Plaintiff argues that a municipality may be held liable even where an individual defendant may

be entitled to qualified immunity.  Doc. 48, pp. 20-21 (citing *Baker v. Union Township*, 587 Fed.

Appx. 229, 237 (6th Cir. 2014)).

The Sixth Circuit has recently reiterated that, "where there has been no showing of

individual constitutional violations on the part of the officers involved, there can be no municipal

liability."  *Baker v. City of Trenton*, 936 F.3d 523, 535 (6th Cir. 2019); *see also Burkey v.*

*Hunter*, 790 Fed. Appx. 40 (6th Cir. Jan. 15, 2020) (when affirming the trial court's grant of

summary judgment to individual and county defendants, the court stated: "This circuit has

continuously held that under § 1983, a county can only be held liable if there is a showing of an underlying constitutional violation by the county's officials[]") (internal citations omitted). Plaintiff's reliance on *Baker*, 587 Fed. Appx. at 237, to argue otherwise is misplaced. In *Baker*, the court described a situation different from the one before this court, i.e., one in which an individual officer's misconduct was unconstitutional but was not in violation of clearly established law. *Id.* Here, as discussed above, Plaintiff has not demonstrated that the evidence is sufficient to allow a reasonable jury to determine that Defendant Trunko was deliberately indifferent to Jordan's serious medical needs. There being no showing of a constitutional violation in this case, Plaintiff cannot establish municipal liability under § 1983. *Baker*, 936 F.3d at 535; *see also Burkey*, 790 Fed. Appx. 40. Thus, Plaintiff's first and second causes of action asserting municipal liability under § 1983 should be dismissed.

Additionally, "the right to medical care for serious medical needs does <u>not</u> encompass the right to be screened correctly for suicidal tendencies." *Comstock*, 273 F.3d at 702. (internal quotations omitted) (emphasis supplied); *Gray*, 399 F.3d at 616 (indicating that "there is no general constitutional right of detainees to receive suicide screenings or be placed in suicide safe facilities, unless the detainee has somehow demonstrated a strong likelihood of committing suicide[]") (discussing *Barber v. City of Salem, Ohio*, 953 F.2d 232, 237 (6th Cir. 1992) and citing *Danese*, 875 F.2d at 1244 and *Crocker v. County of Macomb*, 199 Fed Appx. 718, 724 (6th Cir. 2005) (unpublished)). Also, the Supreme Court has held "no decision of this Court establishes the right to the proper implementation of adequate suicide prevention protocols." *Taylor v. Barkes*, 575 U.S. 822, 135 S.Ct. 2042, 2044, 192 L.Ed.2d 78 (2015); *see also Broughton v. Premier Health Care Services, Inc.*, 656 Fed. Appx. 54, 57 (6th Cir. July 15, 2016) (quoting *Comstock*, 273 F.3d at 703 and *Taylor*, 135 S.Ct. at 2044). Thus, Plaintiff cannot

establish a constitutional violation based on its claim that Summit County had a policy or custom that resulted in inmates not being properly screened for suicidal tendencies.

Plaintiff argues that Ms. Paulus-Bland testified that Jordan's multiple risk factors entitled him to a screening (Doc. 43, p. 10, citing Doc. 40-8, p. 129:7-13) but Jordan was never assessed for his suicide risk by a qualified mental health professional. Ms. Paulus-Bland's testimony was not that Jordan was not assessed. Rather, she indicated that an assessment as to Jordan's suicide risk was completed but he was not identified as being at a higher risk for suicide. Doc. 40-8, p. 129:2-13. Further, Jordan was seen and assessed by medical professionals on more than one occasion while at Summit County Jail. Counseling was recommended but Jordan never sought such services while detained. Plaintiff nevertheless seeks to establish municipal liability on the basis that Summit County Jail medical providers, who are not named in this action, were not properly credentialed or supervised as required by Ohio law. However, a "failure to comply with a state regulation is not itself a constitutional violation." *Barber*, 953 F.2d at 240; *see also Smith v. Eyke*, 2011 WL 1528155, * 9 (W.D. Mich. Apr. 20, 2011) ("failure to comply with a statute, administrative rule, or policy does not itself rise to the level of a constitutional violation[]") (citing Sixth Circuit cases, including *Barber*, 953 F.2d at 240).

The evidence shows that Jordan himself denied being suicidal when he met with medical providers at the Summit County Jail; he did not attempt suicide during the four months he was detained prior to February 12, 2016; and individuals in close contact with him did not perceive him to be suicidal. Nevertheless, Plaintiff contends that an inference that Jordan was a suicide risk should have been drawn and additional medical treatment should have been provided to Jordan in light of general suicide risk factors, e.g., Jordan's being a white male, age 63, with physical health concerns (seizure disorder and hemorrhagic stroke), mental health concerns

(history of depression), allegations of crimes of a shocking nature, a history of alcohol abuse, and a family history of suicide, Doc. 48, p. 10 (citing Dr. Byrnes' Report (Exhibit 136 (Doc. 44-13) and Ms. Paulus-Bland's deposition (Exhibit 157 (Doc. 44-14, pp. 26, 28)). However, as discussed above, "an official's failure to alleviate a significant risk that *he should have perceived but did not*, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838 (emphasis supplied). And, "[j]ail officials cannot be charged with knowledge of a particular detainee's high suicide risk based solely on the fact that the detainee fits a profile of individuals who purportedly are more likely to commit suicide than those who do not fit the profile in all respects." *Crocker ex rel. Estate of Tarzwell v. County of Macomb*, 119 Fed. Appx. 718, 723 (6th Cir. Jan. 4, 2005). Rather, "a plaintiff must show that there was a 'strong,' 'obvious,' or 'clearly foreseeable' likelihood 'that he would attempt to take his own life in such a manner that failure to take adequate precautions amounted to deliberate indifference.'" *Broughton*, 645 Fed. Appx. at 57 (citing *Gray v. City of Detroit*, 339 F.3d 612, 616 (6th Cir. 2005)).

Further, "Eighth Amendment liability requires more than ordinary lack of due care for the prisoner's interests or safety." *Farmer*, 511 U.S. at 835 (internal quotations and citations omitted). Thus, even if Plaintiff could show that the medical providers at the Summit County Jail departed from an acceptable standard of care by providing services for which they were not properly credentialed or not properly supervised, Plaintiff has not shown that that amounts to something more than negligence. *See e.g. Burgess v. Fisher*, 735 F.3d 462, 477 (6th Cir. 2013) (finding no deliberate indifference where plaintiff's expert stated that a licensed practical nurse should have further inspected the inmate's injury and possibly could have discovered the fractures and asserted that the nurse who evaluated the inmate departed from the acceptable

standard of care). Plaintiff attempts to argue that Jordan's case is not an instance of occasional negligent administration of mental health care. Doc. 51, p. 10. She asserts that the evidence shows that the Defendants' policy and custom resulted in the systemic failure to provide mental health services at the Summit County Jail with qualified providers. Doc. 51, p. 10 (relying on *McCullum v. Tepe*, 2011 WL 13186318, * 5 (S.D. Ohio Mar. 28, 2011)). Plaintiff makes this conclusory argument without identifying evidence to support multiple examples of mental health care failures to support her claim as the plaintiff did in *McCullum*. Furthermore, assuming arguendo that there was a lack of proper credentialing or supervision of mental health providers at the jail, Plaintiff has not presented evidence showing that Summit County or its officials were aware that medical care being provided was so inadequate that the County can be said to have been deliberately indifferent to the constitutional rights of inmates.

"Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860, n. 5 (6th Cir. 1976). Plaintiff argues but has not shown that this is a case where no treatment was provided or that the treatment was so woefully inadequate as to amount to no treatment at all. Jordan was assessed for suicide risk. There is no evidence that Jordan sought and was denied treatment. He was offered counseling but declined.

While Jordan's death is unfortunate, Plaintiff has failed to present sufficient evidence from which a jury could reasonably find unconstitutional conduct or that a policy or custom of Summit County or a failure to train was the moving force behind a constitutional violation.

For the reasons discussed herein, Summit County is entitled to summary judgment on Plaintiff's first cause of action (deliberate indifference) and Summit County and Sheriff Barry in

his official capacity are entitled to summary judgment on Plaintiff's second cause of action (failure to train).

## IV. Conclusion

For the reasons explained herein, Defendants' Motion for Summary Judgment is **GRANTED** and, Plaintiff's Motion for Partial Summary Judgment is **DENIED**.   Accordingly, Plaintiff's Complaint is dismissed with prejudice as to all remaining claims and defendants.


March 10, 2020                                    */s/ Kathleen B. Burke*                    
                                                  KATHLEEN B. BURKE
                                                  United States Magistrate Judge